IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED

20 AP 14 PM 3:07

REED J. SEATON,  ROBERT ALLISON §
AND KEVIN WEST, §
     Plaintiffs §
§
VS. §
§
BLACKSTONE MEZZANINE §
PARTNERS, L.P., BLACKSTONE §
MEZZANINE HOLDINGS, L.P.,  GE §
CAPITAL CFE, INC., AND GENERAL §
ELECTRIC CAPITAL CORPORATION, §
     Defendants §

A04 CA 210 SS

NO. _____

## PLAINTIFFS' ORIGINAL COMPLAINT

Reed J. Seaton ("Seaton"), Robert Allison ("Allison") and Kevin West ("West") file this Original Complaint against Blackstone Mezzanine Partners, L.P. ("Blackstone Partners") Blackstone Mezzanine Holdings, L.P. ("Blackstone Holdings"), and GE Capital CFE, Inc. ("GE Capital"), and General Electric Capital Corporation ("GECC"), as follows:

## I.

## PARTIES

1.    Seaton, Allison and West are individuals residing in Travis County, Texas.

2.    Blackstone Partners is a Delaware limited partnership which has conducted business in the state of Texas, and has entered agreements in the state of Texas, which are the subject matter of this proceeding and which form the basis for an exercise of jurisdiction in the state of Texas pursuant to Section 17.041 et seq. of the Texas Civil Practice and Remedies Code.

Blackstone Partners does not maintain a registered agent within the state of Texas.  Accordingly, service may be made by serving the Secretary of State of the State of Texas who will forward process to Blackstone Partners at its home office address, to the attention of Salvatore Gentile, 345 Park Avenue, 28th Floor, New York, New York, 10154.

3.      Blackstone Holdings is a Delaware limited partnership which has conducted business in the state of Texas, and has entered agreements in the state of Texas, which are the subject matter of this proceeding and which form the basis for an exercise of jurisdiction in the state of Texas pursuant to Section 17.041 et seq. of the Texas Civil Practice and Remedies Code. Blackstone Holdings does not maintain a registered agent within the state of Texas.  Accordingly, service may be made by serving the Secretary of State of the State of Texas who will forward process to Blackstone Holdings at its home office address, to the attention of Salvatore Gentile, 345 Park Avenue, 28th Floor, New York, New York, 10154.

4.      GE Capital is a Delaware corporation which has conducted business in the state of Texas, and has entered agreements in the state of Texas, which are the subject matter of this proceeding and which form the basis for an exercise of jurisdiction in the state of Texas pursuant to Section 17.041 et seq. of the Texas Civil Practice and Remedies Code. GE Capital does not maintain a registered agent within the state of Texas.  Accordingly, service may be made by serving the Secretary of State of the State of Texas who will forward process to GE Capital at its home office address, to the attention of Account Officer, Merchant Banking/Mezzanine, 500 West Monroe Street, Chicago, Illinois 60661.

5.     GECC is a Delaware corporation which conducts business in the State of Texas, and has entered agreements and conducted actions which form the basis of this suit.  GECC may be served through its registered agent in Texas, CT Corporation System, 350 North St. Paul Street, Dallas, Texas 75201.

## II.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1332 because the amount in controversy exceeds $75,000.00, exclusive of interest and costs, and because there is complete diversity of citizenship.

7.     Venue is proper in this Court because it presides over the district and division where the Plaintiffs reside, where all or part of the cause of action arose, and where the obligations at issue in this suit are performable.

## III.

## BACKGROUND

### ASPG Purchases the Stock of SRI

8.     In 1996, Seaton, West and Allison were shareholders, officers, and directors of Southwest Recreational Industries, Inc. ("SRI"), a Texas corporation, which manufactured and installed artificial turf for athletic facilities.

9.     Pursuant to a "Stock Purchase Agreement" dated August 29, 1996, Plaintiffs conveyed their stock in SRI to American Sports Product Group, Inc. ("ASPG") for the consideration set forth in the Stock Purchase Agreement.  Among other things, each Plaintiff

received a Promissory Note in the amount of $333,333.33, payable by ASPG. True and correct copies of the Promissory Notes are attached hereto as Exhibit "A-1" through "A-3" and incorporated herein by reference.  Mr. Seaton and SRI also entered an Employment Agreement dated September 18,1996, for Mr. Seaton to continue to serve as President and CEO of SRI; this Employment Agreement was amended and restated pursuant to a subsequent Employment Agreement dated January 1, 1999.

### ASSI Assumes the Obligations of ASPG

10.    Pursuant to a "Assignment and Assumption Agreement" dated September 18, 1996, American Sports Systems, Inc. ("ASSI") agreed that it would be liable for all obligations of ASPG arising pursuant to the Stock Purchase Agreement.  ASPG, however, was not relieved of its obligations under the Stock Purchase Agreement nor of its liability under the Promissory Notes. A true and correct copy of the Assignment and Assumption Agreement is attached hereto as Exhibit "B" and incorporated herein by reference.

### ASPG Issues a New Promissory Notes to Plaintiffs

11.    On June 26, 2002, ASPG issued three "Subordinated Promissory Note" in the original principal amount of $467,682.22, one each payable to each Plaintiffs.  The Subordinated Promissory Notes issued as substitutes for the Promissory Notes dated September 18, 1996. True and correct copies of the Subordinated Promissory Notes are attached hereto as Exhibits "C-1" through "C-3" and incorporated herein by reference.

**Blackstone Partners, Blackstone Holdings and GE Capital Provide New Financing**

12.     Thereafter, in connection with financing provided to ASSI, SRI and ASPG, and their affiliates, on or about June 26, 2002, Blackstone Partners, Blackstone Holdings, GE Capital and others entered a "Note and Warrant Purchase Agreement" for the issuance of $21 million in Senior Subordinated Notes, as well as Warrants to purchase certain common stock (the "Note and Warrant Purchase Agreement"). A true and correct copy of excerpts of the Note and Warrant Purchase Agreement is attached hereto as Exhibit "D" and incorporated herein by reference. This financing was subordinate to senior debt held by GECC pursuant to a Second Amended and Restated Credit Agreement dated as of June 26, 2002.

13.     Pursuant to the Note and Warrant Purchase Agreement, Blackstone Partners, Blackstone Holdings and GE Capital provided financing to ASSI, ASPG, SRI and related entities, although the financing was subordinated to previous secured financing which had been provided by GE Capital CFE, Inc. At the time of the Note and Warrant Purchase Agreement, Mr. Seaton was an officer and director of SRI, ASPG, and ASSI, and was a director of certain affiliated entities.

14.     During the negotiations leading to the Note and Warrant Purchase Agreement, Mr. Seaton specifically stated to the representatives of Blackstone Partners, Blackstone Holdings and GE Capital that the debt would not be senior to the Subordinated Promissory Notes and the other Promissory Notes. The representatives of Blackstone Partners, Blackstone Holdings and GE Capital agreed, represented and warranted that Plaintiffs' debt would be senior to the debt issued

pursuant to the Note and Warrant Purchase Agreement.  At no time did Plaintiffs agree to subordinate their debt.

15.    Additionally, pursuant to the express terms of the Note and Warrant Purchase Agreement:

a.    The indebtedness issued pursuant to the Note and Warrant Purchase Agreement was to be senior to or equal to all of the unsecured Indebtedness (as that term is defined in the Agreement) of the debtor-parties.  *See* Section 4.26.

b.    Blackstone Partners, Blackstone Holdings, GE Capital and the other parties to the Agreement, agreed that, another Promissory Note (known as the "Armstrong Note") that had been issued with the Stock Purchase Agreement would be junior in payment rights to the Blackstone indebtedness.  *See* Section 4.32.  Nowhere does the Note Warrant Agreement provide that the indebtedness of Blackstone Partners, Blackstone Holdings or GE Capital is senior to that owed to Plaintiffs.

**Mr. Seaton, ASPG and SRI Enter the Separation Agreement**

16.    In November 2003, Mr. Seaton entered a "Separation Agreement and General Release" (the "Separation Agreement") by and between himself, ASPG, and SRI, pursuant to which Mr. Seaton agreed to resign his position as a officer and director of ASPG and as a director of any of ASPG's affiliates, including SRI, for the consideration set forth in the Separation Agreement.  The Separation Agreement terminated substantially all of the obligations under the

January 1, 1999 Employment Agreement.  A true and correct copy of the Separation Agreement is attached hereto as Exhibit "E".  Among other things, Mr. Seaton was to receive a payment and benefits of approximately $600,000.00 per year for each year through March 31, 2005.

**GECC Usurps Financial Control**

17.     Beginning in late 2003, GECC, itself or through its agents, upon information and belief, had usurped and was effectively controlling the financial decision-making process of ASSI, ASPG and SRI by either explicitly disapproving payments or refusing to authorize payments to creditors.  GECC specifically stated that payments to Seaton under the Separation Agreement could not be made, declining to authorize signatures on checks presented by ASPG for payment.  Moreover, GECC exercised a "pocket veto" over payments on the Subordinated Promissory Notes by ignoring requests to authorize payments.

18.     SRI filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code on February 13, 2004.  ASPG and ASSI have subsequently filed for bankruptcy protection.

**ASPG and ASSI Default in Payments**

19.     ASPG and ASSI have failed to make the payments due under the Subordinated Promissory Notes and under the Separation Agreement, and all amounts represented by these instruments are due and owing.  As noted above, ASSI assumed the responsibility of ASPG pursuant to the Stock Purchase Agreement, which would include the Subordinated Promissory Notes and, because it was issued as a result of the Stock Purchase Agreement, the Separation Agreement.  Plaintiffs did not release ASPG from its obligations under these agreements. Blackstone Partners and Blackstone Holdings, and, upon information and belief, GE Capital now

dispute Plaintiffs contention that the indebtedness owed to Plaintiffs is senior, and the language of the Note and Warrant Purchase Agreement, and contend that their indebtedness is senior to that owed to Plaintiffs.

20.     All conditions precedent to Plaintiffs' recovery on the claims and causes of action asserted herein have occurred.

## IV.

## DECLARATORY JUDGMENT

### (Against Blackstone Holdings, Blackstone Partners and GE Capital)

21.     As noted above, Blackstone Holdings, Blackstone Partners and, upon information and belief, GE Capital now contend that the debt to them is senior to the debt owed to Plaintiffs. The Note and Warrant Purchase Agreement is, at best, ambiguous on the issue. Accordingly, a genuine dispute exists on this issue. Pursuant to §37.001 *et seq.* of the Texas Civil Practice & Remedies Code and/or 28 U.S.C. §2201 *et seq.*and Rule 57 of the Federal Rules of Civil Procedure, Mr. Seaton seeks a declaration that the indebtedness owed to Plaintiffs is senior to, or, alternatively (only if the Court determines that he is not senior to), equal to, the indebtedness owed to Blackstone Holdings, Blackstone Partners and GE Capital, and that Blackstone Holdings, Blackstone Partners and GE Capital may not recover their indebtedness from ASPG, ASSI or any affiliate or subsidiary of those entities, prior to recovery by Plaintiffs of the amounts owed to them by ASPG and ASSI.

## EQUITABLE SUBORDINATION

### (Against GECC)

22.     Through its actions described above, GECC has, with no legal justification or privilege, tortiously interfered with the business relationships between Plaintiffs and ASPG, ASSI and SRI by assuming control of these entities financial decision-making process and refusing to authorize payments when funds were available.  Additionally, GECC's conduct in this regard constitutes inequitable conduct by usurping the normal corporate governance process to benefit itself at the expense of Plaintiffs.  These actions have damaged Plaintiffs by denying them payments under the Subordinated Promissory Notes and, in the case of Mr. Seaton, the Separation Agreement.  Accordingly, GECC's debt should be subordinated to the claims of Plaintiffs.

### ATTORNEYS FEES

23.     Pursuant to the express terms of Section 37.009 of the Texas Civil Practice & Remedies Code and/or pursuant to 28 U.S.C. §2201, Plaintiffs are entitled to recover their reasonable attorneys' fees incurred in connection with this matter, or against Blackstone Partners, Blackstone Holdings and GE Capital for which they hereby sues.

### JURY DEMAND

Plaintiffs demand a jury trial pursuant to Rules 38 and 57 of the Federal Rules of Civil Procedure.

WHEREFORE, based on the foregoing, Plaintiffs request that, upon final hearing, they recover a declaratory judgment against Blackstone Holdings, Blackstone Partners and GE Capital that the indebtedness owed to Plaintiffs is senior to or, alternatively, equal to, the indebtedness

owed to Blackstone Partners, Blackstone Holdings and GE Capital by ASPG, ASSI, or any affiliate or subsidiary of those entities, and judgment against GECC that its debt is subordinate to Plaintiffs' claims, that Plaintiffs recover their attorneys' fees, costs of Court, and such other and further relief to which they may show themselves justly entitled.

Respectfully submitted,

HOHMANN, TAUBE & SUMMERS, L.L.P.

By: _____

Robert Summers
State Bar No. 19506800
Mark. C. Taylor
State Bar No. 19713225
Andrew S. Hanawalt
State Bar No. 24039311
100 Congress Avenue, Suite 1600
Austin, Texas 78701
(512) 472-5997
(512) 472-5248 (FAX)

ATTORNEY FOR PLAINTIFFS

COPY

THIS NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT") OR UNDER THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR AN EXEMPTION THEREFROM UNDER SUCH ACT AND UNDER ANY APPLICABLE STATE LAWS.

## PROMISSORY NOTE

New York, New York

$333,333.33                              September 18, 1996

        FOR VALUE RECEIVED, American Sports Products Group Inc., a Delaware corporation ("Maker"), promises to pay to Reed J. Seaton ("Payee"), at Southwest Recreational Industries, Inc., 701 Leander Drive, Leander, TX  78641 or elsewhere as Payee shall hereafter designate by written notice to Maker, in lawful money of the United States of America, the principal amount of Three Hundred Thirty Three Thousand Three Hundred Thirty Three dollars and Thirty Three cents ($333,333.33), together with interest on the unpaid principal balance from the date hereof until maturity, at the rate of seven percent (7%) per annum.

        This Note is issued pursuant to that certain "Stock Purchase Agreement", dated as of August 29, 1996 (the "Agreement"), among Payee, Maker and certain other parties named therein.  Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement.

        The indebtedness evidenced by this Note is subordinate and junior in right of payment to the prior payment in full of (i) indebtedness of Maker and its Affiliates to institutional lenders as such indebtedness may exist from time to time and (ii) indebtedness of Maker and its Affiliates arising under capital leases (collectively, "Senior Debt").  Payee, by acceptance of this Note, agrees to execute and deliver any subordination agreement or similar document with any such institutional lender or capital lessor as may, from time to time, be reasonably requested by such institutional lender or capital lessor in order to evidence the subordination contemplated herein.

        Interest accrued on the unpaid principal balance hereof shall be added, in arrears, to the unpaid principal balance hereof on the last day of March and September of each year, commencing March 31, 1997.

COPY

EXHIBIT A-1

COPY

The entire unpaid principal balance hereof and all accrued interest thereon shall be due and payable on March , 2004. Maker may prepay the principal balance hereof in whole or in part at any time and from time to time without payment of any premium or penalty.

All payments, when received, shall be credited first to accrued interest, with the balance applied to the reduction of the principal amount.

In the event of a breach by the Sellers, or any of them, of any of the representations, or warranties, or covenants set forth in the Agreement, Maker shall have the right to offset, dollar for dollar, under the terms and conditions set forth in Section 8.9 of the Agreement and subject to the limitations contained in Article Eight of the Agreement, a sum equal to all of Buyer's Damages arising as a result thereof against the principal balance hereof, the next principal payments, and/or the next interest payment(s) due hereunder, at the sole discretion of Maker. Notwithstanding the foregoing, however, Maker shall have no right to offset under the terms of this Note unless and until Maker has given to Payee written notice of its claim of offset, which notice shall specify the breach or default of Payee giving rise to the offset right, and Payee shall not have cured such breach or default within ten (10) days from the date such notice is given. Maker shall have the right to offset the amount of such claim in accordance with the terms of this Note, subject to the terms and conditions of Article Eight of the Agreement.

So long as any amount is outstanding hereunder, the Maker agrees that it shall not declare, pay or set apart for payment any dividend or distribution on any of its capital stock, nor make any payment on account of, or set apart for payment, money for a sinking or other similar fund for the purchase, redemption or other retirement of any of its capital stock. Notwithstanding the foregoing sentence, Maker shall be permitted to purchase shares of the stock of Maker from former employees of Maker (other than T. Guy Minetti) and from former employees of Affiliates of the Maker and their assigns, estates and heirs, so long as such purchase does not result in the occurrence of an Event of Default and is approved in accordance with applicable law.

So long as any amount is outstanding hereunder, the Maker agrees that it shall not issue any debt unless (i) such debt ranks pari passu with, or junior to, the indebtedness evidenced by this Note and (ii) after giving effect to the issuance thereof and the application of the proceeds thereof, the Pro Forma Interest Coverage Ratio is at least 2.0 to 1.

COPY

COPY

For purposes of the preceding paragraph, (i) "Pro Forma Interest Coverage Ratio" shall mean, as of any date of determination, the ratio of EBITDA to Interest Expense for the fiscal year of Maker most recently ended, as adjusted assuming (A) the issuance of the subordinated debt in question on the first day of such year, (B) payment of interest on such subordinated debt during such year, (C) the application of the proceeds of such subordinated debt on the first day of such year, and (D) the operation by Maker during such year of the business, if any, acquired by Maker with such proceeds, (ii) "EBITDA" shall mean, for any period, the revenues from continuing operations of Maker and its subsidiaries for such period less associated costs, but excluding Interest Expense, management fees paid to affiliates, income taxes, depreciation and amortization, determined on a consolidated basis in accordance with generally accepted accounting principles consistently applied, and (iii) "Interest Expense" shall mean, for any period, the amount of interest expense, both expensed and capitalized, of Maker and its subsidiaries, determined on a consolidated basis in accordance with generally accepted accounting principles consistently applied, for such period on the aggregate principal amount of their indebtedness.

So long as any amount is outstanding hereunder, Maker agrees that it shall preserve, renew and keep in full force and effect its corporate existence and as soon as available, but in any event within the earlier of (i) 120 days after the end of each fiscal year of Maker or (ii) the date provided to the holder of the Senior Debt, furnish to Payee a copy of the consolidated balance sheet of the Company and its consolidated subsidiaries as at the end of such fiscal year and the related consolidated statements of stockholders' equity and cash flows and consolidated statements of income of Maker and its consolidated subsidiaries for such fiscal year.

The occurrence of any of the following will constitute an event of default ("Event of Default") under this Note:

(a)  Maker's failure to pay an installment of principal when due.

(b)  The default by Maker in the performance of any other term, covenant or agreement contained in this Note, which default is by its nature curable, and such default shall not have been remedied to the reasonable satisfaction of Payee or waived in writing by Payee within thirty (30) days after written notice of such default has been given to Maker.  Any such term, covenant or agreement which is performable by the payment of money shall be

COPY



deemed curable within such thirty (30) day period.

(c)   Maker (i) makes an assignment for the benefit of creditors or admits in writing Maker's inability to pay its debts generally as they become due, or (ii) applies to any tribunal for the appointment of a trustee or receiver of any substantial part of Maker's assets, or (iii) commences any voluntary proceedings under any bankruptcy, reorganization, arrangement, insolvency, readjustment of debt, dissolution or other liquidation law of any jurisdiction, or (iv) becomes the subject of any such involuntary proceedings and Maker indicates Maker's approval, consent or acquiescence, or (v) becomes the subject of an order appointing a trustee or receiver, adjudicating it bankrupt or insolvent, or approving a petition in any such involuntary proceeding, and such order remains in effect for sixty (60) days.

(d)   The sale of more than 50% of the equity interest of the Maker to a Person other than an Affiliate of UBS Capital LLC, Tudor Investment or Max C. Chapman, Jr.

(e)   The sale of more than 50% of the equity interest of the Maker to an Affiliate of UBS Capital LLC, Tudor Investment or Max C. Chapman, Jr. which, in the reasonable judgment of the Sellers, acting collectively, materially impairs the credit standing of the Maker.

(f)   The initial public offering of Maker's common stock which raises proceeds (exclusive of underwriting discounts and commissions) of at least $10,000,000 or any public offering by the existing shareholders of Maker of their shares of common stock of Maker.

(g)   The default under any Senior Debt, which is not cured in accordance with the terms of the Senior Debt, and which results in the holder of the Senior Debt accelerating its maturity.

Upon the occurrence of any Event of Default hereunder, the entire unpaid balance of the principal debt evidenced hereby, together with any other sums due hereunder,

with interest accrued thereon, shall, at the option of Payee, become immediately due and payable.

One or more executions may forthwith issue on any judgment or judgments obtained hereunder without exhaustion of remedies under this Note. Any right or remedy herein is intended to be cumulative, and not exclusive, of any other right or remedy so provided or provided by law, equity, statute or otherwise. All or any of such rights or remedies may be exercised concurrently or in such other manner as Payee shall decide. No failure on the part of Payee to exercise any of such rights or remedies shall be deemed a waiver thereof or of any default hereunder.

Except as set forth herein, demand, notice of demand, presentation for payment, notice of non-payment or dishonor, protest, and notice of protest are hereby waived by Maker. The granting, without notice of any extension or of time for payment of any sums or sums due hereunder, or for the performance of any covenant, condition or agreement contained herein, or the granting of any other indulgences to Maker, or the taking or releasing of other or additional security for the indebtedness evidenced hereby, or any other modification or amendment of this Note shall in no way release or discharge the liability of Maker, or of any endorser, guarantor or other person secondarily liable for this Note. Maker and any other persons presently liable hereon agree that additional makers, endorsers, guarantors or sureties may become parties hereto or liable hereon without notice to them and without affecting their liability hereunder.

All notices, requests, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given if personally delivered, telexed or telecopied to, or, if mailed, when received by, the other party at the following addresses (or at such other address as shall be given in writing by any party to the others):

    If to Maker, to:

    American Sports Products Group Inc.
    70 West Red Oak Lane
    White Plains, New York   10604
    Attention: T. Guy Minetti
    Telephone: (914)
    Telecopier: (914) 697-4801



With a required copy (which shall not
constitute notice to the principal) to:

Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, New York  10166-0193
Attention: Steven P. Buffone, Esq.
Telephone: (212) 351-3936
Telecopier: (212) 351-4035


If to Payee, to:

Reed J. Seaton
Southwest Recreational Industries, Inc.
701 Leander Drive
Leander, TX  78641
Telephone:      (512)-259-0080
Telecopier:     (512)-259-3404

With a required copy (which shall not
constitute notice to the principal) to:


Drenner & Stuart
301 Congress Avenue
Suite 2100
Austin, TX  78701
Attn:  Don Stuart


        This Note shall bind Maker and Maker's successors
and assigns and the benefits hereof shall inure to Payee and
Payee's successors and assigns.

        This Note shall be governed by the internal,
substantive laws of the State of Delaware, without giving
effect to the conflict of laws rules thereof.  If any term or
provision of this Note or the application thereof to any
person or circumstances shall, to any extent, be invalid or
unenforceable, the remainder of this Note, or the application
of such term or provision to persons or circumstances other
than those as to which it is held invalid or unenforceable, of
this Note shall be valid and be enforceable to the fullest
extent permitted by law.

        Nothing in this Note contained shall be construed or
shall operate, either presently or prospectively, (a) to
require Maker to pay interest at a rate greater than is at any
time lawful in such case to contract for but shall require
payment of interest only to the extent of such lawful rate, or

6

(b) to require Maker to make any payment or do any act contrary to law.  If it should be held that the interest payable under this Note is in excess of the maximum permitted by law, the interest chargeable hereunder (whether included in the face amount or otherwise) shall be reduced to the maximum amount permitted by law, and any excess of the said maximum amount permitted by law shall be canceled automatically and, at the option of Payee, if theretofore or thereafter paid, shall be either refunded to Maker or credited to the principal balance of this Note (without prepayment penalties) and applied to the payment of the last maturing installment or installments of the indebtedness evidenced hereby (whether or not then due and payable) and not to the payment of interest.

Maker shall pay on demand any and all reasonable costs and expenses, including but not limited to, attorneys' fees, incurred by Payee in connection with any default under this Note, whether or not suit be instituted to enforce the terms hereof.

MAKER:

AMERICAN SPORTS PRODUCTS GROUP INC.

By: _____
Name: _____
Title: _____

NA962410.083/5+

7



THIS NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT") OR UNDER THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR AN EXEMPTION THEREFROM UNDER SUCH ACT AND UNDER ANY APPLICABLE STATE LAWS.

## PROMISSORY NOTE

New York, New York

$333,333.33                              September 18, 1996

FOR VALUE RECEIVED, American Sports Products Group Inc., a Delaware corporation ("Maker"), promises to pay to Robert G. Allison ("Payee"), at Southwest Recreational Industries, Inc., 701 Leander Drive, Leander, TX 78641 or elsewhere as Payee shall hereafter designate by written notice to Maker, in lawful money of the United States of America, the principal amount of Three Hundred Thirty Three Thousand Three Hundred Thirty Three dollars and Thirty Three cents ($333,333.33), together with interest on the unpaid principal balance from the date hereof until maturity, at the rate of seven percent (7%) per annum.

This Note is issued pursuant to that certain "Stock Purchase Agreement", dated as of August 29, 1996 (the "Agreement"), among Payee, Maker and certain other parties named therein. Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement.

The indebtedness evidenced by this Note is subordinate and junior in right of payment to the prior payment in full of (i) indebtedness of Maker and its Affiliates to institutional lenders as such indebtedness may exist from time to time and (ii) indebtedness of Maker and its Affiliates arising under capital leases (collectively, "Senior Debt"). Payee, by acceptance of this Note, agrees to execute and deliver any subordination agreement or similar document with any such institutional lender or capital lessor as may, from time to time, be reasonably requested by such institutional lender or capital lessor in order to evidence the subordination contemplated herein.

Interest accrued on the unpaid principal balance hereof shall be added, in arrears, to the unpaid principal balance hereof on the last day of March and September of each year, commencing March 31, 1997.

EXHIBIT A-2

COPY

The entire unpaid principal balance hereof and all accrued interest thereon shall be due and payable on March 1ᶻ, 2004. Maker may prepay the principal balance hereof in whole or in part at any time and from time to time without payment of any premium or penalty.

All payments, when received, shall be credited first to accrued interest, with the balance applied to the reduction of the principal amount.

In the event of a breach by the Sellers, or any of them, of any of the representations, or warranties, or covenants set forth in the Agreement, Maker shall have the right to offset, dollar for dollar, under the terms and conditions set forth in Section 8.9 of the Agreement and subject to the limitations contained in Article Eight of the Agreement, a sum equal to all of Buyer's Damages arising as a result thereof against the principal balance hereof, the next principal payments, and/or the next interest payment(s) due hereunder, at the sole discretion of Maker. Notwithstanding the foregoing, however, Maker shall have no right to offset under the terms of this Note unless and until Maker has given to Payee written notice of its claim of offset, which notice shall specify the breach or default of Payee giving rise to the offset right, and Payee shall not have cured such breach or default within ten (10) days from the date such notice is given. Maker shall have the right to offset the amount of such claim in accordance with the terms of this Note, subject to the terms and conditions of Article Eight of the Agreement.

So long as any amount is outstanding hereunder, the Maker agrees that it shall not declare, pay or set apart for payment any dividend or distribution on any of its capital stock, nor make any payment on account of, or set apart for payment, money for a sinking or other similar fund for the purchase, redemption or other retirement of any of its capital stock. Notwithstanding the foregoing sentence, Maker shall be permitted to purchase shares of the stock of Maker from former employees of Maker (other than T. Guy Minetti) and from former employees of Affiliates of the Maker and their assigns, estates and heirs, so long as such purchase does not result in the occurrence of an Event of Default and is approved in accordance with applicable law.

So long as any amount is outstanding hereunder, the Maker agrees that it shall not issue any debt unless (i) such debt ranks pari passu with, or junior to, the indebtedness evidenced by this Note and (ii) after giving effect to the issuance thereof and the application of the proceeds thereof, the Pro Forma Interest Coverage Ratio is at least 2.0 to 1.

2



For purposes of the preceding paragraph, (i) "Pro Forma Interest Coverage Ratio" shall mean, as of any date of determination, the ratio of EBITDA to Interest Expense for the fiscal year of Maker most recently ended, as adjusted assuming (A) the issuance of the subordinated debt in question on the first day of such year, (B) payment of interest on such subordinated debt during such year, (C) the application of the proceeds of such subordinated debt on the first day of such year, and (D) the operation by Maker during such year of the business, if any, acquired by Maker with such proceeds, (ii) "EBITDA" shall mean, for any period, the revenues from continuing operations of Maker and its subsidiaries for such period less associated costs, but excluding Interest Expense, management fees paid to affiliates, income taxes, depreciation and amortization, determined on a consolidated basis in accordance with generally accepted accounting principles consistently applied, and (iii) "Interest Expense" shall mean, for any period, the amount of interest expense, both expensed and capitalized, of Maker and its subsidiaries, determined on a consolidated basis in accordance with generally accepted accounting principles consistently applied, for such period on the aggregate principal amount of their indebtedness.

So long as any amount is outstanding hereunder, Maker agrees that it shall preserve, renew and keep in full force and effect its corporate existence and as soon as available, but in any event within the earlier of (i) 120 days after the end of each fiscal year of Maker or (ii) the date provided to the holder of the Senior Debt, furnish to Payee a copy of the consolidated balance sheet of the Company and its consolidated subsidiaries as at the end of such fiscal year and the related consolidated statements of stockholders' equity and cash flows and consolidated statements of income of Maker and its consolidated subsidiaries for such fiscal year.

The occurrence of any of the following will constitute an event of default ("Event of Default") under this Note:

    (a)  Maker's failure to pay an installment of principal when due.

    (b)  The default by Maker in the performance of any other term, covenant or agreement contained in this Note, which default is by its nature curable, and such default shall not have been remedied to the reasonable satisfaction of Payee or waived in writing by Payee within thirty (30) days after written notice of such default has been given to Maker.  Any such term, covenant or agreement which is performable by the payment of money shall be



deemed curable within such thirty (30) day period.

(c)  Maker (i) makes an assignment for the benefit of creditors or admits in writing Maker's inability to pay its debts generally as they become due, or (ii) applies to any tribunal for the appointment of a trustee or receiver of any substantial part of Maker's assets, or (iii) commences any voluntary proceedings under any bankruptcy, reorganization, arrangement, insolvency, readjustment of debt, dissolution or other liquidation law of any jurisdiction, or (iv) becomes the subject of any such involuntary proceedings and Maker indicates Maker's approval, consent or acquiescence, or (v) becomes the subject of an order appointing a trustee or receiver, adjudicating it bankrupt or insolvent, or approving a petition in any such involuntary proceeding, and such order remains in effect for sixty (60) days.

(d)  The sale of more than 50% of the equity interest of the Maker to a Person other than an Affiliate of UBS Capital LLC, Tudor Investment or Max C. Chapman, Jr.

(e)  The sale of more than 50% of the equity interest of the Maker to an Affiliate of UBS Capital LLC, Tudor Investment or Max C. Chapman, Jr. which, in the reasonable judgment of the Sellers, acting collectively, materially impairs the credit standing of the Maker.

(f)  The initial public offering of Maker's common stock which raises proceeds (exclusive of underwriting discounts and commissions) of at least $10,000,000 or any public offering by the existing shareholders of Maker of their shares of common stock of Maker.

(g)  The default under any Senior Debt, which is not cured in accordance with the terms of the Senior Debt, and which results in the holder of the Senior Debt accelerating its maturity.

Upon the occurrence of any Event of Default hereunder, the entire unpaid balance of the principal debt evidenced hereby, together with any other sums due hereunder,

with interest accrued thereon, shall, at the option of Payee, become immediately due and payable.

One or more executions may forthwith issue on any judgment or judgments obtained hereunder without exhaustion of remedies under this Note.  Any right or remedy herein is intended to be cumulative, and not exclusive, of any other right or remedy so provided or provided by law, equity, statute or otherwise.  All or any of such rights or remedies may be exercised concurrently or in such other manner as Payee shall decide.  No failure on the part of Payee to exercise any of such rights or remedies shall be deemed a waiver thereof or of any default hereunder.

Except as set forth herein, demand, notice of demand, presentation for payment, notice of non-payment or dishonor, protest, and notice of protest are hereby waived by Maker. The granting, without notice of any extension or of time for payment of any sums or sums due hereunder, or for the performance of any covenant, condition or agreement contained herein, or the granting of any other indulgences to Maker, or the taking or releasing of other or additional security for the indebtedness evidenced hereby, or any other modification or amendment of this Note shall in no way release or discharge the liability of Maker, or of any endorser, guarantor or other person secondarily liable for this Note.  Maker and any other persons presently liable hereon agree that additional makers, endorsers, guarantors or sureties may become parties hereto or liable hereon without notice to them and without affecting their liability hereunder.

All notices, requests, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given if personally delivered, telexed or telecopied to, or, if mailed, when received by, the other party at the following addresses (or at such other address as shall be given in writing by any party to the others):

If to Maker, to:

American Sports Products Group Inc.
70 West Red Oak Lane
White Plains, New York  10604
Attention: T. Guy Minetti
Telephone: (914)
Telecopier: (914) 697-4801

COPY

With a required copy (which shall not
constitute notice to the principal) to:

Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, New York  10166-0193
Attention: Steven P. Buffone, Esq.
Telephone: (212) 351-3936
Telecopier: (212) 351-4035


If to Payee, to:

Robert G. Allison
Southwest Recreational Industries, Inc.
701 Leander Drive
Leander, TX  78641
Telephone:     (512)-259-0080
Telecopier:    (512)-259-3404

With a required copy (which shall not
constitute notice to the principal) to:


Drenner & Stuart
301 Congress Avenue
Suite 2100
Austin, TX  78701
Attn:  Don Stuart


        This Note shall bind Maker and Maker's successors
and assigns and the benefits hereof shall inure to Payee and
Payee's successors and assigns.

        This Note shall be governed by the internal,
substantive laws of the State of Delaware, without giving
effect to the conflict of laws rules thereof.  If any term or
provision of this Note or the application thereof to any
person or circumstances shall, to any extent, be invalid or
unenforceable, the remainder of this Note, or the application
of such term or provision to persons or circumstances other
than those as to which it is held invalid or unenforceable. of
this Note shall be valid and be enforceable to the fullest
extent permitted by law.

        Nothing in this Note contained shall be construed or
shall operate, either presently or prospectively, (a) to
require Maker to pay interest at a rate greater than is at any
time lawful in such case to contract for but shall require
payment of interest only to the extent of such lawful rate, or

6

(b) to require Maker to make any payment or do any act contrary to law. If it should be held that the interest payable under this Note is in excess of the maximum permitted by law, the interest chargeable hereunder (whether included in the face amount or otherwise) shall be reduced to the maximum amount permitted by law, and any excess of the said maximum amount permitted by law shall be canceled automatically and, at the option of Payee, if theretofore or thereafter paid, shall be either refunded to Maker or credited to the principal balance of this Note (without prepayment penalties) and applied to the payment of the last maturing installment or installments of the indebtedness evidenced hereby (whether or not then due and payable) and not to the payment of interest.

Maker shall pay on demand any and all reasonable costs and expenses, including but not limited to, attorneys' fees, incurred by Payee in connection with any default under this Note, whether or not suit be instituted to enforce the terms hereof.

MAKER:

AMERICAN SPORTS PRODUCTS GROUP INC.

By: _____ COPY

Name:

Title:

NA962410.083/5+

7

COPY

THIS NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT") OR UNDER THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR AN EXEMPTION THEREFROM UNDER SUCH ACT AND UNDER ANY APPLICABLE STATE LAWS.

## PROMISSORY NOTE

New York, New York

$333,333.33                                September 18, 1996

FOR VALUE RECEIVED, American Sports Products Group Inc., a Delaware corporation ("Maker"), promises to pay to Kevin C. West ("Payee"), at Southwest Recreational Industries, Inc., 701 Leander Drive, Leander, TX  78641 or elsewhere as Payee shall hereafter designate by written notice to Maker, in lawful money of the United States of America, the principal amount of Three Hundred Thirty Three Thousand Three Hundred Thirty Three dollars and Thirty Three cents ($333,333.33), together with interest on the unpaid principal balance from the date hereof until maturity, at the rate of seven percent (7%) per annum.

This Note is issued pursuant to that certain "Stock Purchase Agreement", dated as of August 29, 1996 (the "Agreement"), among Payee, Maker and certain other parties named therein.  Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement.

The indebtedness evidenced by this Note is subordinate and junior in right of payment to the prior payment in full of (i) indebtedness of Maker and its Affiliates to institutional lenders as such indebtedness may exist from time to time and (ii) indebtedness of Maker and its Affiliates arising under capital leases (collectively, "Senior Debt").  Payee, by acceptance of this Note, agrees to execute and deliver any subordination agreement or similar document with any such institutional lender or capital lessor as may, from time to time, be reasonably requested by such institutional lender or capital lessor in order to evidence the subordination contemplated herein.

Interest accrued on the unpaid principal balance hereof shall be added, in arrears, to the unpaid principal balance hereof on the last day of March and September of each year, commencing March 31, 1997.

COPY

EXHIBIT A-3

COPY

The entire unpaid principal balance hereof and all accrued interest thereon shall be due and payable on March 18, 2004.  Maker may prepay the principal balance hereof in whole or in part at any time and from time to time without payment of any premium or penalty.

All payments, when received, shall be credited first to accrued interest, with the balance applied to the reduction of the principal amount.

In the event of a breach by the Sellers, or any of them, of any of the representations, or warranties, or covenants set forth in the Agreement, Maker shall have the right to offset, dollar for dollar, under the terms and conditions set forth in Section 8.9 of the Agreement and subject to the limitations contained in Article Eight of the Agreement, a sum equal to all of Buyer's Damages arising as a result thereof against the principal balance hereof, the next principal payments, and/or the next interest payment(s) due hereunder, at the sole discretion of Maker.  Notwithstanding the foregoing, however, Maker shall have no right to offset under the terms of this Note unless and until Maker has given to Payee written notice of its claim of offset, which notice shall specify the breach or default of Payee giving rise to the offset right, and Payee shall not have cured such breach or default within ten (10) days from the date such notice is given.  Maker shall have the right to offset the amount of such claim in accordance with the terms of this Note, subject to the terms and conditions of Article Eight of the Agreement.

So long as any amount is outstanding hereunder, the Maker agrees that it shall not declare, pay or set apart for payment any dividend or distribution on any of its capital stock, nor make any payment on account of, or set apart for payment, money for a sinking or other similar fund for the purchase, redemption or other retirement of any of its capital stock.  Notwithstanding the foregoing sentence, Maker shall be permitted to purchase shares of the stock of Maker from former employees of Maker (other than T. Guy Minetti) and from former employees of Affiliates of the Maker and their assigns, estates and heirs, so long as such purchase does not result in the occurrence of an Event of Default and is approved in accordance with applicable law.

So long as any amount is outstanding hereunder, the Maker agrees that it shall not issue any debt unless (i) such debt ranks pari passu with, or junior to, the indebtedness evidenced by this Note and (ii) after giving effect to the issuance thereof and the application of the proceeds thereof, the Pro Forma Interest Coverage Ratio is at least 2.0 to 1.

2

COPY

For purposes of the preceding paragraph, (i) "Pro Forma Interest Coverage Ratio" shall mean, as of any date of determination, the ratio of EBITDA to Interest Expense for the fiscal year of Maker most recently ended, as adjusted assuming (A) the issuance of the subordinated debt in question on the first day of such year, (B) payment of interest on such subordinated debt during such year, (C) the application of the proceeds of such subordinated debt on the first day of such year, and (D) the operation by Maker during such year of the business, if any, acquired by Maker with such proceeds, (ii) "EBITDA" shall mean, for any period, the revenues from continuing operations of Maker and its subsidiaries for such period less associated costs, but excluding Interest Expense, management fees paid to affiliates, income taxes, depreciation and amortization, determined on a consolidated basis in accordance with generally accepted accounting principles consistently applied, and (iii) "Interest Expense" shall mean, for any period, the amount of interest expense, both expensed and capitalized, of Maker and its subsidiaries, determined on a consolidated basis in accordance with generally accepted accounting principles consistently applied, for such period on the aggregate principal amount of their indebtedness.

So long as any amount is outstanding hereunder, Maker agrees that it shall preserve, renew and keep in full force and effect its corporate existence and as soon as available, but in any event within the earlier of (i) 120 days after the end of each fiscal year of Maker or (ii) the date provided to the holder of the Senior Debt, furnish to Payee a copy of the consolidated balance sheet of the Company and its consolidated subsidiaries as at the end of such fiscal year and the related consolidated statements of stockholders' equity and cash flows and consolidated statements of income of Maker and its consolidated subsidiaries for such fiscal year.

The occurrence of any of the following will constitute an event of default ("Event of Default") under this Note:

 (a)  Maker's failure to pay an installment of principal when due.

 (b)  The default by Maker in the performance of any other term, covenant or agreement contained in this Note, which default is by its nature curable, and such default shall not have been remedied to the reasonable satisfaction of Payee or waived in writing by Payee within thirty (30) days after written notice of such default has been given to Maker.  Any such term, covenant or agreement which is performable by the payment of money shall be

COPY

deemed curable within such thirty (30) day period.

(c) Maker (i) makes an assignment for the benefit of creditors or admits in writing Maker's inability to pay its debts generally as they become due, or (ii) applies to any tribunal for the appointment of a trustee or receiver of any substantial part of Maker's assets, or (iii) commences any voluntary proceedings under any bankruptcy, reorganization, arrangement, insolvency, readjustment of debt, dissolution or other liquidation law of any jurisdiction, or (iv) becomes the subject of any such involuntary proceedings and Maker indicates Maker's approval, consent or acquiescence, or (v) becomes the subject of an order appointing a trustee or receiver, adjudicating it bankrupt or insolvent, or approving a petition in any such involuntary proceeding, and such order remains in effect for sixty (60) days.

(d) The sale of more than 50% of the equity interest of the Maker to a Person other than an Affiliate of UBS Capital LLC, Tudor Investment or Max C. Chapman, Jr.

(e) The sale of more than 50% of the equity interest of the Maker to an Affiliate of UBS Capital LLC, Tudor Investment or Max C. Chapman, Jr. which, in the reasonable judgment of the Sellers, acting collectively, materially impairs the credit standing of the Maker.

(f) The initial public offering of Maker's common stock which raises proceeds (exclusive of underwriting discounts and commissions) of at least $10,000,000 or any public offering by the existing shareholders of Maker of their shares of common stock of Maker.

(g) The default under any Senior Debt, which is not cured in accordance with the terms of the Senior Debt, and which results in the holder of the Senior Debt accelerating its maturity.

Upon the occurrence of any Event of Default hereunder, the entire unpaid balance of the principal debt evidenced hereby, together with any other sums due hereunder,

COPY

with interest accrued thereon, shall, at the option of Payee, become immediately due and payable.

One or more executions may forthwith issue on any judgment or judgments obtained hereunder without exhaustion of remedies under this Note.  Any right or remedy herein is intended to be cumulative, and not exclusive, of any other right or remedy so provided or provided by law, equity, statute or otherwise.  All or any of such rights or remedies may be exercised concurrently or in such other manner as Payee shall decide.  No failure on the part of Payee to exercise any of such rights or remedies shall be deemed a waiver thereof or of any default hereunder.

Except as set forth herein, demand, notice of demand, presentation for payment, notice of non-payment or dishonor, protest, and notice of protest are hereby waived by Maker. The granting, without notice of any extension or of time for payment of any sums or sums due hereunder, or for the performance of any covenant, condition or agreement contained herein, or the granting of any other indulgences to Maker, or the taking or releasing of other or additional security for the indebtedness evidenced hereby, or any other modification or amendment of this Note shall in no way release or discharge the liability of Maker, or of any endorser, guarantor or other person secondarily liable for this Note.  Maker and any other persons presently liable hereon agree that additional makers, endorsers, guarantors or sureties may become parties hereto or liable hereon without notice to them and without affecting their liability hereunder.

All notices, requests, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given if personally delivered, telexed or telecopied to, or, if mailed, when received by, the other party at the following addresses (or at such other address as shall be given in writing by any party to the others):

If to Maker, to:

American Sports Products Group Inc.
70 West Red Oak Lane
White Plains, New York  10604
Attention: T. Guy Minetti
Telephone: (914)
Telecopier:(914) 697-4801

COPY

With a required copy (which shall not
constitute notice to the principal) to:

Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, New York  10166-0193
Attention: Steven P. Buffone, Esq.
Telephone: (212) 351-3936
Telecopier: (212) 351-4035


If to Payee, to:

Kevin C. West
Southwest Recreational Industries, Inc.
701 Leander Drive
Leander, TX  78641
Telephone:      (512)-259-0080
Telecopier:     (512)-259-3404

With a required copy (which shall not
constitute notice to the principal) to:


Drenner & Stuart
301 Congress Avenue
Suite 2100
Austin, TX  78701
Attn:  Don Stuart


        This Note shall bind Maker and Maker's successors
and assigns and the benefits hereof shall inure to Payee and
Payee's successors and assigns.

        This Note shall be governed by the internal,
substantive laws of the State of Delaware, without giving
effect to the conflict of laws rules thereof.  If any term or
provision of this Note or the application thereof to any
person or circumstances shall, to any extent, be invalid or
unenforceable, the remainder of this Note, or the application
of such term or provision to persons or circumstances other
than those as to which it is held invalid or unenforceable, of
this Note shall be valid and be enforceable to the fullest
extent permitted by law.

        Nothing in this Note contained shall be construed or
shall operate, either presently or prospectively, (a) to
require Maker to pay interest at a rate greater than is at any
time lawful in such case to contract for but shall require
payment of interest only to the extent of such lawful rate, or

6

(b) to require Maker to make any payment or do any act contrary to law.  If it should be held that the interest payable under this Note is in excess of the maximum permitted by law, the interest chargeable hereunder (whether included in the face amount or otherwise) shall be reduced to the maximum amount permitted by law, and any excess of the said maximum amount permitted by law shall be canceled automatically and, at the option of Payee, if theretofore or thereafter paid, shall be either refunded to Maker or credited to the principal balance of this Note (without prepayment penalties) and applied to the payment of the last maturing installment or installments of the indebtedness evidenced hereby (whether or not then due and payable) and not to the payment of interest.

Maker shall pay on demand any and all reasonable costs and expenses, including but not limited to, attorneys' fees, incurred by Payee in connection with any default under this Note, whether or not suit be instituted to enforce the terms hereof.

**MAKER:**

AMERICAN SPORTS PRODUCTS GROUP INC.

By: _____
     Name:
     Title:

NA962410.083/5+

7

## ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement") is made as of the 18th day of September, 1996, by and between American Sports Products Group Inc., a Delaware corporation ("Assignor"), and American Sports Systems Inc., a Delaware corporation ("Assignee").

### BACKGROUND

A.     Assignor has heretofore purchased all of the issued and outstanding shares of stock of Southwest Recreational Industries, Inc. ("Southwest") pursuant to the Stock Purchase Agreement dated as of August 29, 1996 between Assignor and the shareholders of Southwest (the "Stock Purchase Agreement").

B.     The Stock Purchase Agreement permits assignment with the prior written consent of the parties thereto, which consent is attached hereto as Schedule A.

C.     Assignor wishes to assign any continuing rights it may hold under the Stock Purchase Agreement to Assignee.

D.     Assignor further wishes to assign to Assignee all of the issued and outstanding shares of capital stock (the "Shares") held by Assignor in Southwest, Sport Court, Inc. and American Sports International, Ltd. d/b/a American Athletic Inc.

E.     Upon such assignments, Assignee will issue to Assignor, in consideration of such assignments, 100 shares of its common stock, $.01 per share, which upon issuance will constitute 100% of the issued and outstanding capital stock of Assignee.

NOW, THEREFORE, in consideration of the foregoing premises and the covenants and agreements contained herein the parties hereto agree as follows:

1.     Assignor hereby assigns to Assignee all of its right, title and interest in and to the Stock Purchase Agreement and the Shares, in consideration for the issuance by Assignee of 100 shares of its common stock to Assignor and the agreement of Assignee to assume any and all obligations of Assignor arising pursuant to the Stock Purchase Agreement.

2.     Assignee hereby assumes and agrees to discharge any and all obligations of Assignor arising pursuant to the Stock Purchase Agreement.  Notwithstanding the foregoing, this Agreement shall not release Assignor from any of its obligations arising pursuant to the Stock Purchase Agreement.

3.     Assignor and Assignee shall execute, acknowledge (if appropriate) and deliver or cause to be delivered such further documents and instruments as may reasonably be requested by the other party to implement the purposes of this Assignment and Assumption Agreement.

4.     This Agreement shall be governed, construed and interpreted in accordance with the internal law, not the law pertaining to conflicts or choice of law, of the State of Delaware.

5.     Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to them in the Stock Purchase Agreement.

IN WITNESS WHEREOF, the parties have executed and delivered this Assignment and Assumption Agreement as of the day and year first written above.

**American Sports Products Group Inc.**         **American Sports Systems Inc.**

By: _T. Guy Minnoth_                   By: _T. Guy Minnoth_
Name: T. Guy Minnoth                    Name: T. Guy Minnoth
Title: Vice Chairman                    Title: Vice Chairman

## SCHEDULE A

### CONSENT TO ASSIGNMENT

Each of the undersigned hereby consents to the assignment of the Stock Purchase Agreement dated as of August 29, 1996 by and among the shareholders of Southwest Recreational Industries, Inc. listed below and American Sports Products Group Inc. ("ASPGI") to American Sports Systems Inc. ("ASSI") pursuant to the Assignment and Assumption Agreement dated as of September 1Ø, 1996 between ASPGI and ASSI, as copy of which has been provided to and reviewed by the undersigned.

River II, L.P.

By: River Associates, LLC
General Partner

By: _____
Title: _____

_____
Robert G. Allison

_____
James B. Baker Profit Sharing Plan

_____
Mike D. Brookshire

_____
Tim T. Morris

_____
Reed J. Seaton

_____
Kevin C. West

## SCHEDULE A

## CONSENT TO ASSIGNMENT

Each of the undersigned hereby consents to the assignment of the Stock Purchase Agreement dated as of August 29, 1996 by and among the shareholders of Southwest Recreational Industries, Inc. listed below and American Sports Products Group Inc. ("ASPGI") to American Sports Systems Inc. ("ASSI") pursuant to the Assignment and Assumption Agreement dated as of September ___, 1996 between ASPGI and ASSI, as copy of which has been provided to and reviewed by the undersigned.

River II, L.P.

By: River Associates, LLC
General Partner

By: _____
Title: _____

Robert G. Allison

James B. Baker Profit Sharing Plan

Mike D. Brookshire

Tim T. Morris

Reed J. Seaton

Kevin C. West

NADR2230.07004+

## SCHEDULE A

## CONSENT TO ASSIGNMENT

Each of the undersigned hereby consents to the assignment of the Stock Purchase Agreement dated as of August 29, 1996 by and among the shareholders of Southwest Recreational Industries, Inc. listed below and American Sports Products Group Inc. ("ASPGI") to American Sports Systems Inc. ("ASSI") pursuant to the Assignment and Assumption Agreement dated as of September __, 1996 between ASPGI and ASSI, as copy of which has been provided to and reviewed by the undersigned.

River II, L.P.

By: River Associates, LLC
General Partner

By: _____
Title:

*Robert Allison*
Robert G. Allison

_____
James B. Baker Profit Sharing Plan

_____
Mike D. Brookshire

_____
Tim T. Morris

_____
Reed J. Sexton

_____
Kevin C. West

N4862530.076/6+

THIS NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT") OR UNDER THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR AN EXEMPTION THEREFROM UNDER SUCH ACT AND UNDER ANY APPLICABLE STATE LAWS.

## SUBORDINATED PROMISSORY NOTE

$467,682.22                                            June 26, 2002

FOR VALUE RECEIVED, American Sports Products Group Inc., a Delaware corporation ("Maker"), promises to pay to Reed J. Seaton (hereinafter referred to as "Payee"), at 11009 Pencewood Ct., Austin, Texas 78750 or elsewhere as Payee shall hereafter designate by written notice to Maker, in lawful money of the United States of America, the principal amount of Four Hundred Sixty Seven Thousand Six Hundred Eighty Two and 22/100 dollars ($467,682.22), together with interest on the unpaid principal balanced from the date hereof until maturity, at the rate of seven percent (7%) per annum.

This Note is issued pursuant to that certain Stock Purchase Agreement, dated as of August 29, 1996 (the "Agreement"); among Payee, Maker and certain other parties named therein. Terms not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement.

The indebtedness evidenced by this Note is subordinate and junior in right of payment to the prior payment in full of all indebtedness of Maker and its Affiliates pursuant to that certain Second Amended and Restated Credit Agreement (the "Credit Agreement"), dated as of June 26, 2002 and as amended to the date hereof, among Maker, its Affiliates party thereto and Heller Financial, Inc. as agent, including the guaranty of Maker in connection with the Credit Agreement and further including any refinancing, extension or other modification of such indebtedness; to the extent that the indebtedness of Maker and its Affiliates, as so refinanced, extended or otherwise modified has a maturity date prior to August 30, 2007 ("Senior Debt"). If any payment or distribution on account of this Note is made by the Maker or any other person to Payee prior to the payment in full of all Senior Debt, such payment or distribution shall be promptly paid over to the agent or other designated representative of the holder of Senior Debt for application against the Senior Debt then remaining unpaid. Until all Senior Debt is paid in full in cash, Payee shall not, without the prior written consent of the holders of Senior Debt, agree to any amendments, modifications or supplement to this Note. The provisions of this paragraph shall inure to the benefit

C:\My Documents\prom.note.seaton.6.26.02.wpd

EXHIBIT C-1

of the holders of Senior Debt.  Payee, by acceptance of this Note, agrees to execute and deliver any subordination agreement or similar document with any such institutional lender or capital lessor as may, from time to time, be reasonably requested by such institutional lender or capital lessor in order to evidence the subordination contemplated herein.

Interest accrued on the unpaid principal balance hereof shall be added, in arrears, to the unpaid principal balance hereof on the last day of March and September of each year, commencing September 30, 2002.

The entire unpaid principal balance hereof and all accrued interest thereon shall be due and payable on August 30, 2007.  Maker may prepay the principal balance hereof in whole or in part at any time and from time to time without payment of any premium or penalty.

All payments, when received, shall be credited first to accrued interest, with the balance applied to the reduction of the principal amount.

In the event of a breach by the Sellers, or any of them, of any of the representations, or warranties, or covenants set forth in the Agreement, Maker shall have the right to offset, dollar for dollar, under the terms and conditions set forth in Section 8.9 of the Agreement and subject to the limitations contained in Article Eight of the Agreement, a sum equal to all of the Buyer's Damages arising as a result thereof against the principal balance hereof, the next principal payments, and/or the next interest payment(s) due hereunder, at the sole discretion of Maker.  Notwithstanding the foregoing, however, Maker shall have no right to offset under the terms of this Note unless and until Maker has given to Payee written notice of its claim of offset, which notice shall specify the breach or default of Payee giving rise to the offset right, and Payee shall not have cured such breach or default within ten (10) days from the date such notice is given. Maker shall have the right to offset the amount of such claim in accordance with the terms of this Note, subject to the terms and conditions of Article Eight of the Agreement.

COPY

So long as any amount is outstanding hereunder, the Maker agrees that it shall not declare, pay or set apart for payment any dividend or distribution on any of its capital stock, nor make any payment on account of, or set apart for payment, money for a sinking or other similar fund for the purchase, redemption or other retirement of any of its capital stock. Notwithstanding the foregoing sentence, Maker shall be permitted to purchase shares of stock of Maker from former employees of Maker and from former employees of Affiliates of the Maker and their assigns, estates and heirs, so long as such purchase does not result in the occurrence of an Event of Default (as defined below) and is approved in accordance with applicable law.

So long as any amount is outstanding hereunder, Maker agrees that it shall preserve, renew and keep in full force and effect its corporate existence and as soon as available, but in any event within the earlier of (i) 120 days after the end of each fiscal year of Maker or (ii) the date provided to the holder of the Senior Debt, furnish to Payee a copy of the consolidated balance sheet of the Company and its consolidated subsidiaries as at the end of such fiscal year and the related consolidated statements of stockholders' equity and cash flows and consolidated statements of income of Maker and its consolidated subsidiaries for such fiscal year.

The occurrence of any of the following will constitute an event of default ("Event of Default") under this Note:

    (a)  Maker's failure to pay an installment of principal and/or interest when due.

    (b)  The default by Maker in the performance of any other term, covenant or agreement contained in this Note, which default is by its nature curable, and such default shall not have been remedied to the reasonable satisfaction of Payee or waived in writing by Payee within thirty (30) days after written notice of such default has been given to Maker. Any such term, covenant or agreement which is performable by the payment of money shall be deemed curable within such thirty (30) day period.

    (c)  Maker (i) makes an assignment for the benefit of creditors or admits in writing Maker's inability to pay it debts generally as they become due, or (ii) applies to any tribunal for the appointment of a

trustee or receiver of any substantial part of Maker's assets, or (iii) commences any voluntary proceedings under any bankruptcy, reorganization, arrangement, insolvency, readjustment of debt, dissolution or other liquidation law of any jurisdiction, or (iv) becomes the subject of any such involuntary proceedings and Maker indicates Maker's approval, consent or acquiescence, or (v) becomes the subject of an order appointing a trustee or receiver, adjudicating it bankrupt or insolvent, or proving a petition in any such involuntary proceeding, and such order remains in effect for sixty (60) days.

(d)    The sale of more than 50% of the equity interest of the Maker to a Person other than an Affiliate of UBS Capital II, LLC, Tudor Investment or Max C. Chapman, Jr.

(e)    The initial public offering of Maker's common stock which raises proceeds (exclusive of underwriting discounts and commissions) of at least $20,000,000.00 or any public offering by the existing shareholders of Maker of their shares of common stock of Maker.

(f)    The default under the Senior Debt, which is not cured in accordance with the terms of the Senior Debt, and which results in the holder of the Senior Debt accelerating its maturity.

Upon the occurrence of any Event of Default hereunder, the entire unpaid balance of the principal debt evidenced hereby, together with any other sums due hereunder, with interest accrued thereon, shall, at the option of Payee, become immediately due and payable.

One or more executions may forthwith issue on any judgment or judgments obtained hereunder without exhaustion of remedies under this Note. Any right or remedy herein is intended to be cumulative, and not exclusive, of any other right or remedy so provided or provided by law, equity, statute or otherwise. All or any of such rights or remedies may be exercised concurrently or in such other manner as Payee shall decide. No failure on the part of Payee to exercise any of such rights or remedies shall be deemed a waiver thereof or of any default hereunder.

Except as set forth herein, demand, notice of demand, presentation for payment, notice of non-payment or dishonor, protest, and notice of protest are hereby waived by Maker.  The granting, without notice of any extension or of time for payment of any sums or sums due hereunder, or for the performance of any covenant, condition or agreement contained herein, or the granting of any other indulgences to Maker, or the taking or releasing of other or additional security for the indebtedness evidenced hereby, or any other modification or amendment of this Note shall in no way release or discharge the liability of Maker, or of any endorser, guarantor or other person secondarily liable for this Note; and Maker, any endorser, guarantor or other person secondarily liable for this Note.  Maker and any other persons presently liable hereon agree that additional makers, endorsers, guarantors, or sureties may become parties hereto or liable hereon without notice to them and without affecting their liability hereunder.

All notices, requests, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given if personally delivered, telexed or telecopied to, or, of mailed, when received by, the other party at the following addresses (or at such other address as shall be given in writing by any party to the others):

If to Maker, to:

American Sports Products Group Inc.
701 Leander Drive
Leander, Texas 78641
Attention: Robert A. Hale
Telephone:   (512)259-0080
Telecopier:  (512)259-4221

With a required copy (which shall not constitute notice to the principal) to:

Kaye Scholer LLP
425 Park Avenue
New York, New York 10022
Attention: Edmond Gabbay, Esq.
Telephone:   (212) 836-8000
Telecopier: (212) 836-8689

If to Payee, to:

Reed J. Seaton
11009 Pencewood Court
Austin, Texas 78750
Telephone:
Telecopier:



With a required copy to:

_____
_____
_____

Attention:
Telephone:
Telecopier:

This Note shall bind Maker and Maker's successors and assigns and the benefits hereof shall inure to Payee and Payee's successors and assigns.

This Note shall be governed by the internal, substantive laws of the State of Delaware, without giving effect to the conflict of laws rules thereof. If any term or provision of this Note or the application thereof to any person or circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Note, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, of this Note shall be valid and be enforceable to the fullest extent permitted by law.

Nothing in this Note contained shall be construed or shall operate, either presently or prospectively, (a) to require Maker to pay interest at a rate greater than is at any time lawful in such case to contract for but shall require payment of interest only to the extent of such lawful rate, or (b) to require Maker to make any payment or do any act contrary to law. If it should be held that the interest payable under this Note is in excess of the maximum permitted by law, the interest chargeable hereunder (whether included in the face amount or otherwise) shall be reduced to the maximum amount permitted by law, and any excess of the said maximum amount permitted by law shall be canceled automatically and, at the option of Payee, if theretofore or thereafter paid, shall be either refunded to Maker or credited to the principal balance of this Note (without prepayment penalties) and applied to the payment of the last maturing installment or installments of the

indebtedness evidenced hereby (whether or not then due and payable)and not to the payment of interest.

Maker shall pay on demand any and all reasonable costs and expenses, including but not limited to, attorneys' fees incurred by Payee in connection with any default under this Note, whether or not suit is instituted to enforce the terms hereof.

**This Note has been exchanged and substituted for a Promissory Note issued by Maker to Payee in the principal amount of Three Hundred Thirty Three Thousand Three Hundred Thirty Three and 33/100 dollars ($333,333.00) (the "Original Note") and that portion of the Promissory Notes issued by Maker to (i)River II, L.P., (ii) James B. Baker Profit Sharing Plan, (iii) Tim T. Morris, and (iv) Mike D. Brookshire (collectively the "Assigned Notes"). Upon execution hereof, the Original Note and those portions of the Assigned Notes assigned to Payee shall be cancelled and shall no longer represent a payment obligation of the Maker.**

IN WITNESS WHEREOF, Maker has executed this Note to be effective as of the date first above written.

MAKER:

AMERICAN SPORTS PRODUCTS GROUP INC.

By: _____

Title: Vice President

THIS NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT") OR UNDER THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR AN EXEMPTION THEREFROM UNDER SUCH ACT AND UNDER ANY APPLICABLE STATE LAWS.

## SUBORDINATED PROMISSORY NOTE

$467,682.22                                                    June 26, 2002

        FOR VALUE RECEIVED, American Sports Products Group Inc., a Delaware corporation ("Maker"), promises to pay to Robert G. Allison (hereinafter referred to as "Payee"), at 17700 North Rim Drive, Leander, Texas 78661 or elsewhere as Payee shall hereafter designate by written notice to Maker, in lawful money of the United States of America, the principal amount of Four Hundred Sixty Seven Thousand Six Hundred Eighty Two and 22/100 dollars ($467,682.22), together with interest on the unpaid principal balanced from the date hereof until maturity, at the rate of seven percent (7%) per annum.

        This Note is issued pursuant to that certain Stock Purchase Agreement, dated as of August 29, 1996 (the "Agreement"), among Payee, Maker and certain other parties named therein. Terms not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement.

        The indebtedness evidenced by this Note is subordinate and junior in right of payment to the prior payment in full of all indebtedness of Maker and its Affiliates pursuant to that certain Second Amended and Restated Credit Agreement (the "Credit Agreement"), dated as of June 26, 2002 and as amended to the date hereof, among Maker, its Affiliates party thereto and Heller Financial, Inc. as agent, including the guaranty of Maker in connection with the Credit Agreement and further including any refinancing, extension or other modification of such indebtedness, to the extent that the indebtedness of Maker and its Affiliates, as so refinanced, extended or otherwise modified has a maturity date prior to August 30, 2007("Senior Debt"). If any payment or distribution on account of this Note is made by the Maker or any other person to Payee prior to the payment in full of all Senior Debt, such payment or distribution shall be promptly paid over to the agent or other designated representative of the holder of Senior Debt for application against the Senior Debt then remaining unpaid. Until all Senior Debt is paid in full in cash, Payee shall not, without the prior written consent of the holders of Senior Debt, agree to any amendments, modifications or supplement to this

C:\My Documents\prom.note.allison.6.26.02.wpd

EXHIBIT C-2

Note.  The provisions of this paragraph shall inure to the benefit of the holders of Senior Debt.  Payee, by acceptance of this Note, agrees to execute and deliver any subordination agreement or similar document with any such institutional lender or capital lessor as may, from time to time, be reasonably requested by such institutional lender or capital lessor in order to evidence the subordination contemplated herein.

Interest accrued on the unpaid principal balance hereof shall be added, in arrears, to the unpaid principal balance hereof on the last day of March and September of each year, commencing September 30, 2002.

The entire unpaid principal balance hereof and all accrued interest thereon shall be due and payable on August 30, 2007.  Maker may prepay the principal balance hereof in whole or in part at any time and from time to time without payment of any premium or penalty.

All payments, when received, shall be credited first to accrued interest, with the balance applied to the reduction of the principal amount.

In the event of a breach by the Sellers, or any of them, of any of the representations, or warranties, or covenants set forth in the Agreement, Maker shall have the right to offset, dollar for dollar, under the terms and conditions set forth in Section 8.9 of the Agreement and subject to the limitations contained in Article Eight of the Agreement, a sum equal to all of the Buyer's Damages arising as a result thereof against the principal balance hereof, the next principal payments, and/or the next interest payment(s) due hereunder, at the sole discretion of Maker.  Notwithstanding the foregoing, however, Maker shall have no right to offset under the terms of this Note unless and until Maker has given to Payee written notice of its claim of offset, which notice shall specify the breach or default of Payee giving rise to the offset right, and Payee shall not have cured such breach or default within ten (10) days from the date such notice is given. Maker shall have the right to offset the amount of such claim in accordance with the terms of this Note, subject to the terms and conditions of Article Eight of the Agreement.

So long as any amount is outstanding hereunder, the Maker agrees that it shall not declare, pay or set apart for payment any dividend or distribution on any of its capital stock, nor make any payment on account of, or set apart for payment, money for a sinking or other similar fund for the purchase, redemption or other retirement of any of its capital stock.  Notwithstanding the foregoing sentence, Maker shall be permitted to purchase shares of stock of Maker from former employees of Maker and from former employees of Affiliates of the Maker and their assigns, estates and heirs, so long as such purchase does not result in the occurrence of an Event of Default (as defined below) and is approved in accordance with applicable law.

So long as any amount is outstanding hereunder, Maker agrees that it shall preserve, renew and keep in full force and effect its corporate existence and as soon as available, but in any event within the earlier of (i) 120 days after the end of each fiscal year of Maker or (ii) the date provided to the holder of the Senior Debt, furnish to Payee a copy of the consolidated balance sheet of the Company and its consolidated subsidiaries as at the end of such fiscal year and the related consolidated statements of stockholders' equity and cash flows and consolidated statements of income of Maker and its consolidated subsidiaries for such fiscal year.

The occurrence of any of the following will constitute an event of default ("Event of Default") under this Note:

(a)    Maker's failure to pay an installment of principal and/or interest when due.

(b)    The default by Maker in the performance of any other term, covenant or agreement contained in this Note, which default is by its nature curable, and such default shall not have been remedied to the reasonable satisfaction of Payee or waived in writing by Payee within thirty (30) days after written notice of such default has been given to Maker.  Any such term, covenant or agreement which is performable by the payment of money shall be deemed curable within such thirty (30) day period.

(c)    Maker (i) makes an assignment for the benefit of creditors or admits in writing Maker's inability to pay it debts generally as they become due, or (ii) applies to any tribunal for the appointment of a

trustee or receiver of any substantial part of Maker's assets, or (iii) commences any voluntary proceedings under any bankruptcy, reorganization, arrangement, insolvency, readjustment of debt, dissolution or other liquidation law of any jurisdiction, or (iv) becomes the subject of any such involuntary proceedings and Maker indicates Maker's approval, consent or acquiescence, or (v) becomes the subject of an order appointing a trustee or receiver, adjudicating it bankrupt or insolvent, or proving a petition in any such involuntary proceeding, and such order remains in effect for sixty (60) days.

(d)    The sale of more than 50% of the equity interest of the Maker to a Person other than an Affiliate of UBS Capital II, LLC, Tudor Investment or Max C. Chapman, Jr.

(e)    The initial public offering of Maker's common stock which raises proceeds (exclusive of underwriting discounts and commissions) of at least $20,000,000.00 or any public offering by the existing shareholders of Maker of their shares of common stock of Maker.

(f)    The default under the Senior Debt, which is not cured in accordance with the terms of the Senior Debt, and which results in the holder of the Senior Debt accelerating its maturity.

Upon the occurrence of any Event of Default hereunder, the entire unpaid balance of the principal debt evidenced hereby, together with any other sums due hereunder, with interest accrued thereon, shall, at the option of Payee, become immediately due and payable.

One or more executions may forthwith issue on any judgment or judgments obtained hereunder without exhaustion of remedies under this Note. Any right or remedy herein is intended to be cumulative, and not exclusive, of any other right or remedy so provided or provided by law, equity, statute or otherwise. All or any of such rights or remedies may be exercised concurrently or in such other manner as Payee shall decide. No failure on the part of Payee to exercise any of such rights or remedies shall be deemed a waiver thereof or of any default hereunder.

Except as set forth herein, demand, notice of demand, presentation for payment, notice of non-payment or dishonor, protest, and notice of protest are hereby waived by Maker.  The granting, without notice of any extension or of time for payment of any sums or sums due hereunder, or for the performance of any covenant, condition or agreement contained herein, or the granting of any other indulgences to Maker, or the taking or releasing of other or additional security for the indebtedness evidenced hereby, or any other modification or amendment of this Note shall in no way release or discharge the liability of Maker, or of any endorser, guarantor or other person secondarily liable for this Note; and Maker, any endorser, guarantor or other person secondarily liable for this Note.  Maker and any other persons presently liable hereon agree that additional makers, endorsers, guarantors, or sureties may become parties hereto or liable hereon without notice to them and without affecting their liability hereunder.

All notices, requests, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given if personally delivered, telexed or telecopied to, or, of mailed, when received by, the other party at the following addresses (or at such other address as shall be given in writing by any party to the others):

If to Maker, to:

American Sports Products Group Inc.
701 Leander Drive
Leander, Texas 78641
Attention: Reed J. Seaton
Telephone:   (512)259-0080
Telecopier:  (512)259-4221

With a required copy (which shall not constitute notice to the principal) to:

Kaye Scholer LLP
425 Park Avenue
New York, New York 10022
Attention: Edmond Gabbay, Esq.
Telephone:  (212) 836-8000
Telecopier: (212) 836-8689

If to Payee, to:

IN WITNESS WHEREOF, Maker has executed this Note to be
effective as of the date first above written.

**MAKER:**

SOUTHWEST RECREATIONAL
INDUSTRIES, INC.

By: *Robert Ahles*
Title: *Vice President*

Maker shall pay on demand any and all reasonable costs and expenses, including but not limited to, attorneys' fees incurred by Payee in connection with any default under this Note, whether or not suit is instituted to enforce the terms hereof.

This Note has been exchanged and substituted for a Promissory Note issued by Maker to Payee in the principal amount of Three Hundred Thirty Three Thousand Three Hundred Thirty Three and 33/100 dollars ($333,333.00) (the "Original Note") and that portion of the Promissory Notes issued by Maker to (i) River II, L.P., (ii) James B. Baker Profit Sharing Plan, (iii) Tim T. Morris, and (iv) Mike D. Brookshire that were assigned to Payee (collectively the "Assigned Notes").  Upon execution hereof, the Original Note and those portions of the Assigned Notes assigned to Payee shall be cancelled and shall no longer represent a payment obligation of the Maker.

IN WITNESS WHEREOF, Maker has executed this Note to be effective as of the date first above written.

MAKER:

AMERICAN SPORTS PRODUCTS GROUP INC.

By: _Robert Whaley_

Title: _Vice President_

THIS NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT") OR UNDER THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR AN EXEMPTION THEREFROM UNDER SUCH ACT AND UNDER ANY APPLICABLE STATE LAWS.

<u>**SUBORDINATED PROMISSORY NOTE**</u>

$467,682.22                                                    June 26, 2002

     FOR VALUE RECEIVED, American Sports Products Group Inc., a Delaware corporation ("Maker"), promises to pay to Kevin C. West (hereinafter referred to as "Payee"), at 1800 Fall Creek Drive, Cedar Park, Texas 78613 or elsewhere as Payee shall hereafter designate by written notice to Maker, in lawful money of the United States of America, the principal amount of Four Hundred Sixty Seven Thousand Six Hundred Eighty Two and 22/100 dollars ($467,682.22), together with interest on the unpaid principal balanced from the date hereof until maturity, at the rate of seven percent (7%) per annum.

     This Note is issued pursuant to that certain Stock Purchase Agreement, dated as of August 29, 1996 (the "Agreement"), among Payee, Maker and certain other parties named therein. Terms not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement.

     The indebtedness evidenced by this Note is subordinate and junior in right of payment to the prior payment in full of all indebtedness of Maker and its Affiliates pursuant to that certain Second Amended and Restated Credit Agreement (the "Credit Agreement"), dated as of June 26, 2002 and as amended to the date hereof, among Maker, its Affiliates party thereto and Heller Financial, Inc. as agent, including the guaranty of Maker in connection with the Credit Agreement and further including any refinancing, extension or other modification of such indebtedness, to the extent that the indebtedness of Maker and its Affiliates, as so refinanced, extended or otherwise modified has a maturity date prior to August 30, 2007("Senior Debt"). If any payment or distribution on account of this Note is made by the Maker or any other person to Payee prior to the payment in full of all Senior Debt, such payment or distribution shall be promptly paid over to the agent or other designated representative of the holder of Senior Debt for application against the Senior Debt then remaining unpaid. Until all Senior Debt is paid in full in cash, Payee shall not, without the prior written consent of the holders of Senior Debt, agree to any amendments, modifications or supplement to this

C:\My Documents\prom.note.west.6.26.02.wpd

EXHIBIT C-3

Note. The provisions of this paragraph shall inure to the benefit of the holders of Senior Debt. Payee, by acceptance of this Note, agrees to execute and deliver any such subordination agreement or similar document with any such institutional lender or capital lessor as may, from time to time, be reasonably requested by such institutional lender or capital lessor in order to evidence the subordination contemplated herein.

Interest accrued on the unpaid principal balance hereof shall be added, in arrears, to the unpaid principal balance hereof on the last day of March and September of each year, commencing September 30, 2002.

The entire unpaid principal balance hereof and all accrued interest thereon shall be due and payable on August 30, 2007. Maker may prepay the principal balance hereof in whole or in part at any time and from time to time without payment of any premium or penalty.

All payments, when received, shall be credited first to accrued interest, with the balance applied to the reduction of the principal amount.

In the event of a breach by the Sellers, or any of them, of any of the representations, or warranties, or covenants set forth in the Agreement, Maker shall have the right to offset, dollar for dollar, under the terms and conditions set forth in Section 8.9 of the Agreement and subject to the limitations contained in Article Eight of the Agreement, a sum equal to all of the Buyer's Damages arising as a result thereof against the principal balance hereof, the next principal payments, and/or the next interest payment(s) due hereunder, at the sole discretion of Maker. Notwithstanding the foregoing, however, Maker shall have no right to offset under the terms of this Note unless and until Maker has given to Payee written notice of its claim of offset, which notice shall specify the breach or default of Payee giving rise to the offset right, and Payee shall not have cured such breach or default within ten (10) days from the date such notice is given. Maker shall have the right to offset the amount of such claim in accordance with the terms of this Note, subject to the terms and conditions of Article Eight of the Agreement.

So long as any amount is outstanding hereunder, the Maker agrees that it shall not declare, pay or set apart for payment any dividend or distribution on any of its capital stock, nor make any payment on account of, or set apart for payment, money for a sinking or other similar fund for the purchase, redemption or other retirement of any of its capital stock. Notwithstanding the foregoing sentence, Maker shall be permitted to purchase shares of stock of Maker from former employees of Maker and from former employees of Affiliates of the Maker and their assigns, estates and heirs, so long as such purchase does not result in the occurrence of an Event of Default (as defined below) and is approved in accordance with applicable law.

So long as any amount is outstanding hereunder, Maker agrees that it shall preserve, renew and keep in full force and effect its corporate existence and as soon as available, but in any event within the earlier of (i) 120 days after the end of each fiscal year of Maker or (ii) the date provided to the holder of the Senior Debt, furnish to Payee a copy of the consolidated balance sheet of the Company and its consolidated subsidiaries as at the end of such fiscal year and the related consolidated statements of stockholders' equity and cash flows and consolidated statements of income of Maker and its consolidated subsidiaries for such fiscal year.

The occurrence of any of the following will constitute an event of default ("Event of Default") under this Note:

(a)  Maker's failure to pay an installment of principal and/or interest when due.

(b)  The default by Maker in the performance of any other term, covenant or agreement contained in this Note, which default is by its nature curable, and such default shall not have been remedied to the reasonable satisfaction of Payee or waived in writing by Payee within thirty (30) days after written notice of such default has been given to Maker. Any such term, covenant or agreement which is performable by the payment of money shall be deemed curable within such thirty (30) day period.

(c)  Maker (i) makes an assignment for the benefit of creditors or admits in writing Maker's inability to pay it debts generally as they become due, or (ii) applies to any tribunal for the appointment of a

trustee or receiver of any substantial part of Maker's assets, or (iii) commences any voluntary proceedings under any bankruptcy, reorganization, arrangement, insolvency, readjustment of debt, dissolution or other liquidation law of any jurisdiction, or (iv) becomes the subject of any such involuntary proceedings and Maker indicates Maker's approval, consent or acquiescence, or (v) becomes the subject of an order appointing a trustee or receiver, adjudicating it bankrupt or insolvent, or proving a petition in any such involuntary proceeding, and such order remains in effect for sixty (60) days.

(d)     The sale of more than 50% of the equity interest of the Maker to a Person other than an Affiliate of UBS Capital II, LLC, Tudor Investment or Max C. Chapman, Jr.

(e)     The initial public offering of Maker's common stock which raises proceeds (exclusive of underwriting discounts and commissions) of at least $20,000,000.00 or any public offering by the existing shareholders of Maker of their shares of common stock of Maker.

(f)     The default under the Senior Debt, which is not cured in accordance with the terms of the Senior Debt, and which results in the holder of the Senior Debt accelerating its maturity.

Upon the occurrence of any Event of Default hereunder, the entire unpaid balance of the principal debt evidenced hereby, together with any other sums due hereunder, with interest accrued thereon, shall, at the option of Payee, become immediately due and payable.

One or more executions may forthwith issue on any judgment or judgments obtained hereunder without exhaustion of remedies under this Note. Any right or remedy herein is intended to be cumulative, and not exclusive, of any other right or remedy so provided or provided by law, equity, statute or otherwise. All or any of such rights or remedies may be exercised concurrently or in such other manner as Payee shall decide. No failure on the part of Payee to exercise any of such rights or remedies shall be deemed a waiver thereof or of any default hereunder.

Except as set forth herein, demand, notice of demand, presentation for payment, notice of non-payment or dishonor, protest, and notice of protest are hereby waived by Maker. The granting, without notice of any extension or of time for payment of any sums or sums due hereunder, or for the performance of any covenant, condition or agreement contained herein, or the granting of any other indulgences to Maker, or the taking or releasing of other or additional security for the indebtedness evidenced hereby, or any other modification or amendment of this Note shall in no way release or discharge the liability of Maker, or of any endorser, guarantor or other person secondarily liable for this Note; and Maker, any endorser, guarantor or other person secondarily liable for this Note. Maker and any other persons presently liable hereon agree that additional makers, endorsers, guarantors, or sureties may become parties hereto or liable hereon without notice to them and without affecting their liability hereunder.

All notices, requests, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given if personally delivered, telexed or telecopied to, or, of mailed, when received by, the other party at the following addresses (or at such other address as shall be given in writing by any party to the others):

If to Maker, to:

American Sports Products Group Inc.
701 Leander Drive
Leander, Texas 78641
Attention: Reed J. Seaton
Telephone:    (512)259-0080
Telecopier:  (512)259-4221

With a required copy (which shall not constitute notice to the principal) to:

Kaye Scholer LLP
425 Park Avenue
New York, New York 10022
Attention: Edmond Gabbay, Esq.
Telephone:  (212) 836-8000
Telecopier: (212) 836-8689

If to Payee, to:

Kevin C. West
1800 Fall Creek Drive
Cedar Park, Texas 78613
Telephone:
Telecopier:

With a required copy to:

_____
_____
_____
Attention:
Telephone:
Telecopier:

This Note shall bind Maker and Maker's successors and assigns and the benefits hereof shall inure to Payee and Payee's successors and assigns.

This Note shall be governed by the internal, substantive laws of the State of Delaware, without giving effect to the conflict of laws rules thereof. If any term or provision of this Note or the application thereof to any person or circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Note, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, of this Note shall be valid and be enforceable to the fullest extent permitted by law.

Nothing in this Note contained shall be construed or shall operate, either presently or prospectively, (a) to require Maker to pay interest at a rate greater than is at any time lawful in such case to contract for but shall require payment of interest only to the extent of such lawful rate, or (b) to require Maker to make any payment or do any act contrary to law. If it should be held that the interest payable under this Note is in excess of the maximum permitted by law, the interest chargeable hereunder (whether included in the face amount or otherwise) shall be reduced to the maximum amount permitted by law, and any excess of the said maximum amount permitted by law shall be canceled automatically and, at the option of Payee, if theretofore or thereafter paid, shall be either refunded to Maker or credited to the principal balance of this Note (without prepayment penalties) and applied to the payment of the last maturing installment or installments of the indebtedness evidenced hereby (whether or not then due and payable) and not to the payment of interest.

Maker shall pay on demand any and all reasonable costs and expenses, including but not limited to, attorneys' fees incurred by Payee in connection with any default under this Note, whether or not suit is instituted to enforce the terms hereof.

**This Note has been exchanged and substituted for a Promissory Note issued by Maker to Payee in the principal amount of Three Hundred Thirty Three Thousand Three Hundred Thirty Three and 33/100 dollars ($333,333.00) (the "Original Note") and that portion of the Promissory Notes issued by Maker to (i) River II, L.P., (ii) James B. Baker Profit Sharing Plan, (iii) Tim T. Morris, and (iv) Mike D. Brookshire that were assigned to Payee (collectively the "Assigned Notes"). Upon execution hereof, the Original Note and those portions of the Assigned Notes assigned to Payee shall be cancelled and shall no longer represent a payment obligation of the Maker.**

IN WITNESS WHEREOF, Maker has executed this Note to be effective as of the date first above written.

MAKER:

AMERICAN SPORTS PRODUCTS GROUP INC.

By: _____
Title: Vice President

AMERICAN SPORTS SYSTEMS INC.

SOUTHWEST RECREATIONAL INDUSTRIES, INC.

SPORT COURT, INC.

AMERICAN SPORTS INTERNATIONAL, LTD.

E.J. RENNER & ASSOCIATES, INC.
D/B/A MALOTT PETERSON RENNER, INC.

AMERICAN SPORTS PRODUCTS GROUP INC.


NOTE AND WARRANT PURCHASE AGREEMENT


with


BLACKSTONE MEZZANINE PARTNERS L.P.,

BLACKSTONE MEZZANINE HOLDINGS L.P.,

GENERAL ELECTRIC CAPITAL CORPORATION

and

GE CAPITAL CFE, INC.


$21,000,000 Senior Subordinated Notes Due 2008

Warrants to Purchase up to 2,027 Shares of Common Stock

Dated as of June 26, 2002

STM/225569.7

EXHIBIT D

## NOTE AND WARRANT PURCHASE AGREEMENT

This NOTE AND WARRANT PURCHASE AGREEMENT (this "Agreement") is made and entered into as of June 26, 2002 by and among AMERICAN SPORTS SYSTEMS INC., a Delaware corporation (together with its successors, "Intermediate Holdings"), SOUTHWEST RECREATIONAL INDUSTRIES, INC., a Texas corporation (together with its successors, "SRI"), SPORT COURT, INC., a Delaware corporation (together with its successors, "SCI"), AMERICAN SPORTS INTERNATIONAL, LTD., an Iowa corporation (together with its successors, "ASI"), E.J. RENNER & ASSOCIATES D/B/A MALOTT PETERSON RENNER, INC., a Colorado corporation (together with its successors, "MPR"; Intermediate Holdings, SRI, SCI, ASI and MPR are collectively the "Issuers"), AMERICAN SPORTS PRODUCTS GROUP INC., a Delaware corporation (together with its successors, the "Parent"), BLACKSTONE MEZZANINE PARTNERS L.P., a Delaware limited partnership ("Blackstone Partners"), BLACKSTONE MEZZANINE HOLDINGS L.P., a Delaware limited partnership ("Blackstone Holdings), GENERAL ELECTRIC CAPITAL CORPORATION, a Delaware corporation ("GE Capital" and, together with Blackstone Partners, Blackstone Holdings and their respective successors, assigns and transferees of the Notes in accordance with the terms of this Agreement, collectively, the "Purchasers" and each individually a "Purchaser") and GE CAPITAL CFE, INC., a Delaware corporation ("GE Capital CFE").

## RECITALS

WHEREAS, in order to refinance certain indebtedness, the Issuers have proposed to issue and sell to the Purchasers their Senior Subordinated Notes Due 2008 in an aggregate principal amount equal to $21,000,000, for the consideration and upon the terms and conditions set forth herein; and

WHEREAS, the Parent has agreed to issue to the Purchasers its warrants to purchase an aggregate of up to 2,027 shares of its Common Stock (as hereinafter defined) (subject to adjustment as therein provided) upon the terms and conditions set forth herein, provided that the Warrants relating to the Notes being purchased by GE Capital will be issued to GE Capital CFE;

NOW, THEREFORE, the Parent, the Issuers and the Purchasers agree as follows:

Section 1.    Definitions.

Section 1.1    Defined Terms . For the purposes of this Agreement, the following terms shall have the following respective meanings:

"Accountants" has the meaning ascribed to it in Section 6(b).

1

STM/225569.7

"Hazardous Material" means any substance, material or waste that is regulated by, or forms the basis of liability now or hereafter under, any Environmental Laws, including any material or substance that is (a) defined as a "solid waste," "hazardous waste," "hazardous material," "hazardous substance," "extremely hazardous waste," "restricted hazardous waste," "pollutant," "contaminant," "hazardous constituent," "special waste," "toxic substance" or other similar term or phrase under any Environmental Laws, or (b) petroleum or any fraction or by-product thereof, asbestos, polychlorinated biphenyls (PCB's), or any radioactive substance.

"Indebtedness" means, with respect to any Person, without duplication (a) all indebtedness of such Person for borrowed money or for the deferred purchase price of property payment for which is deferred six (6) months or more, but excluding obligations to trade creditors incurred in the ordinary course of business that are unsecured and not overdue by more than six (6) months unless being contested in good faith, (b) all reimbursement and other obligations with respect to letters of credit, bankers' acceptances and surety bonds, whether or not matured, (c) all obligations evidenced by notes, bonds, debentures or similar instruments, (d) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all Capital Lease Obligations and the present value (discounted at the Index Rate (as defined in the Senior Credit Agreement as in effect on the Closing Date) per annum) of future rental payments under all synthetic leases, (f) all obligations of such Person under commodity purchase or option agreements or other commodity price hedging arrangements, in each case whether contingent or matured, (g) all obligations of such Person under any foreign exchange contract, currency swap agreement, interest rate swap (including interest rate agreements entered into pursuant to Section 2.8 of the Senior Credit Agreement), cap or collar agreement or other similar agreement or arrangement designed to alter the risks of that Person arising from fluctuations in currency values or interest rates, in each case whether contingent or matured, (h) all Indebtedness referred to above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien upon or in property or other assets (including accounts and contract rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness (provided that in the case of Indebtedness pursuant to this clause (h) which is non-recourse, the amount of such Indebtedness shall be limited to the value of the property and the assets securing such Indebtedness), (i) the portion of "earnouts" and similar payment obligations reasonably expected to be paid, and (j) the Obligations.

"Intellectual Property" of any Person means:

11

Section 4.23   Use of Proceeds.  Issuers shall utilize the proceeds of the Notes solely to (i) refinance and repay certain Senior Indebtedness, (ii) repay certain promissory notes listed on Schedule 4.5E, (iii) refinance and repay the Bridge Notes, and (iv) pay costs and expenses of the Transaction.  Schedule 4.5E contains a description of Issuers' sources and uses of funds as of the Closing Date, including Notes to be issued on that date, and a funds flow memorandum detailing how funds from each source are to be transferred for particular uses.

Section 4.24   Foreign Assets Control Regulations.  None of the Credit Parties nor, to the best knowledge of the Parent and each Issuer after due inquiry, any Affiliate of any Credit Party, is, or will be after consummation of the Transactions and application of the proceeds of the Notes, by reason of being a "national" of a "designated foreign country" or a "specially designated national" within the meaning of the Regulations of the Office of Foreign Assets Control, United States Treasury Department (31 C.F.R., Subtitle B, Chapter V), or for any other reason, in violation of, any United States Federal Statute or Presidential Executive Order concerning trade or other relations with any foreign country or any citizen or national thereof or the ownership or operation of any Property.

Section 4.25   Status under Certain Laws.  No Credit Party is an "investment company" or a "person directly or indirectly controlled by or acting on behalf of an investment company" within the meaning of the Investment Company Act of 1940, as amended, or a "holding company," or a "subsidiary company" of a "holding company," or an "affiliate" of a "holding company" or of a "subsidiary company" of a "holding company," within the meaning of the Public Utility Holding Company Act of 1935, as amended.  No Credit Party is subject to regulation as a "common carrier" or "contract carrier" or any similar classification by the Interstate Commerce Commission or under the laws of any state, or is subject to regulation under any other federal, state or local Statute which limits its ability to incur Indebtedness.

Section 4.26   Ranking of Notes.  The Indebtedness represented by the Notes and the other Obligations under the Note Documents of each Credit Party are intended to constitute senior subordinated Indebtedness, and accordingly is, and shall be at all times while the Notes remain outstanding or the Purchasers have any obligation to purchase Notes hereunder, (i) senior in right of payment to, or pari passu with, all other unsecured Indebtedness (other than the unsecured portion, if any, of the Senior Indebtedness), of such Credit Party, as the case may be, respectively, and (ii) senior in right of payment to all other Indebtedness of such Credit Party, as the case may be, which, under the terms of the documents pursuant to or in connection with which such Indebtedness was created or incurred, is subordinated in right of payment to some or all of the other Indebtedness (other than the Senior Indebtedness) of the such Credit Party, as the case may be.

46

STM/225569.7

Section 4.30   <u>Restrictions on or Relating to Subsidiaries</u>. Except as provided in Section 8.2(b) and (c), there does not exist any encumbrance or restriction on the ability of (x) any Subsidiary of the Parent to pay dividends or make any other distributions on its capital stock or any other interest or participation in its profits owned by the Parent or any Subsidiary of the Parent, or to pay any Indebtedness owed to the Parent of a Subsidiary of the Parent, (y) any Subsidiary of the Parent to make loans or advances to the Parent or any of the Parent 's Subsidiaries or (z) any Subsidiary of the Parent to transfer any of its properties or assets to the Parent or any Subsidiary of the Parent, except for such encumbrances or restrictions existing under or by reason of (i) applicable law, and (ii) the Note Documents and the Senior Loan Documents.

Section 4.31   <u>Preferred Stock; Put Rights</u>. The Parent has no obligation to redeem any shares of its Preferred Stock prior to March 1, 2011. The obligation of the Parent to purchase any Stock under Section 4.5 of the Shareholders' Agreement requires the consent of the Required Purchasers pursuant to clause (iii) of the proviso to the second sentence of Section 4.5(e) of the Shareholders' Agreement.

Section 4.32   <u>Seller Notes</u>.

(a)   The execution and delivery of the of the Transaction Documents by any Credit Party and the incurrence of Indebtedness by any Credit Party pursuant to such Transaction Documents, including any future advances under the Senior Credit Agreement, will not violate or result in a default under any Seller Note.

(b)   As of the Closing Date, the Notes and the other Obligations under the Note Documents constitute Senior Debt (as defined in the Armstrong Note) under the terms of the Armstrong Note.

Section 4A.   <u>Representations of the Purchasers</u>. Each Purchaser represents to the Issuers that it is acquiring the Notes and the Warrants to be purchased by it hereunder for its own account, for investment, and not with a view to or for sale in connection with any distribution thereof in violation of the registration provisions of the Securities Act or the rules and regulations promulgated thereunder. The Purchasers understand that (i) the offering and sale of the Notes is intended to be exempt from registration under the Securities Act and (ii) there is no existing public or other market for the Notes and there can be no assurance that the Purchasers will be able to sell or dispose of such Notes purchased by the Purchasers pursuant to this Agreement. Each of the Purchasers is an "Accredited Investor" as such term is defined in Rule 501(a) of Regulation D promulgated under the Securities Act. Each of the Purchasers has sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risks of its investment in the Notes and is capable of bearing the economic risks of such investment.

48

## SEPARATION AGREEMENT AND GENERAL RELEASE

This **Separation Agreement and General Release** (the **"Agreement"**) is made and entered into as of the Effective Date of this Agreement (as set forth in Paragraph 18 herein), by and among (i) **Reed J. Seaton** (**"Seaton"**), residing at 11009 Pencewood Court, Austin, Texas 78750, (ii) **American Sports Products Group Inc.** (**"ASPG"**), a Delaware corporation located at 701 Leander Drive, Leander, Texas 78641, on behalf of itself and any and all past and present parents, affiliates and subsidiaries, and (iii) **Southwest Recreational Industries, Inc.** (**"SRI"**), a Texas corporation located at 701 Leander Drive, Leander, Texas 78641, on behalf of itself and any and all past and present parents, affiliates and subsidiaries  (ASPG, SRI and all such parents, affiliates and subsidiaries, collectively referred to hereinafter as the **"Company"**). Seaton and the Company are sometimes referred to herein as the **"Parties"**.

WHEREAS, Seaton entered into an employment agreement with SRI and ASPG, dated as of January 1, 1999, pursuant to which Seaton served as the President and Chief Executive Officer of SRI and ASPG (the **"Employment Agreement"**);

WHEREAS, Seaton currently serves as President and Chief Executive Officer of ASPG and SRI, and as a member of the Board of Directors of ASPG;

WHEREAS, in conjunction with serving in such capacities, Seaton also currently serves as an officer and member of the Board of Directors of various Company entities;

WHEREAS, Seaton and ASPG are parties to a Stock Subscription Agreement, dated November 4, 1999 (**"Stock Subscription Agreement"**), and Stock Restriction Agreement, dated November 4, 1999 (**"Stock Restriction Agreement"**), pursuant to which, Seaton agreed to purchase 1,750 shares of ASPG common stock (**"Restricted Shares"**), in exchange for a cash payment of $113,750.00 (**"Down Payment"**), and the issuance to ASPG of three (3) Nonrecourse Promissory Notes, each dated November 22, 1999 (collectively, the **"1999 Promissory Notes"**) in the amounts of $219,375.00 (for 375 Restricted Shares), $219,375.00 (for 375 Restricted Shares) and $585,000.00 (for 1,000 Restricted Shares), respectively; which notes were secured by a pledge of the Restricted Shares pursuant to three (3) Collateral Pledge Agreements, each dated November 4, 1999 (collectively, the **"Collateral Pledge Agreements"**) pertaining to 375, 375 and 1,000 Restricted Shares, respectively;

WHEREAS, under Paragraph 2(a) and (b) of the Stock Restriction Agreement, Seaton previously forfeited his right to 750 Restricted Shares, which contemporaneously resulted in the cancellation by ASPG of the corresponding 1999 Promissory Notes and the corresponding Collateral Pledge Agreements;

WHEREAS, Seaton also owns 2,542 shares of ASPG common stock (the **"Remaining Shares"** and collectively with the Restricted Shares, the **"Shares"**)

EXHIBIT E

WHEREAS, Seaton, ASPG and certain other shareholders of ASPG are parties to a Second Amended and Restated Shareholders' Agreement, dated June 26, 2002, as amended by Amendment No. 1 thereto, dated as of August 1, 2002 (as it may be further amended from time to time, "**Second Amended Shareholders' Agreement**"), and Seaton and ASPG are also parties to an Accession Agreement, dated September 18, 1996, as amended by the First Amendment to Accession Agreement, dated June 21, 1999 (as it may be further amended from time to time, "**1996 Accession Agreement**"), and a second Accession Agreement, dated June 22, 1999 ("**1999 Accession Agreement**"), each of which afford ASPG and Seaton, certain rights and responsibilities with respect to the Shares;

WHEREAS, ASPG issued a subordinated promissory note to Seaton, dated June 26, 2002, in the principal amount of $467,682.22 ("**2002 Subordinated Promissory Note**");

WHEREAS, Seaton, ASPG and certain former shareholders of SRI are parties to a Stock Purchase Agreement, dated as of August 26, 1996 (the "**Stock Purchase Agreement**"); and

WHEREAS, the parties have decided that it is in their mutual best interests for Seaton to resign all of his positions as an officer and employee of ASPG and as an officer, employee and director of each of ASPG's subsidiaries and affiliates, including SRI, and for the Company to accept such resignation, on the terms and conditions set forth herein.

NOW, THEREFORE, in an effort to put any and all disputes behind them, for and in consideration of the mutual promises and covenants herein contained and for good and valuable consideration, the sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

1.      Termination of Prior Agreements and Understandings.

a.      Except as expressly and specifically provided for in this Agreement, the Parties agree that any prior agreements and understandings between the Company and Seaton, whether oral or written and of whatever nature are hereby canceled, terminated and superceded by this Agreement and shall be of no further force or effect.

b.      Notwithstanding the provisions of Paragraph 1(a) of this Agreement: (i) Paragraphs 7 and 8 of the Employment Agreement (as amended herein) (attached hereto as Annex I); (ii) the 2002 Subordinated Promissory Note (attached hereto as Annex II); (iii) the Second Amended Shareholders' Agreement (attached hereto as Annex III); (iv) the 1996 Accession Agreement (attached hereto as Annex IV); (v) the 1999 Accession Agreement (attached hereto as Annex V); and (vi) Section 7.5 of the Stock Purchase Agreement (limited to the purposes specified in Paragraph 3(g) of this Agreement) (attached hereto as Annex VI), shall remain in full force and effect, each pursuant to and in accordance with its terms.

2.     **Resignations; Covenants and Agreements of Seaton.** Subject to the terms and conditions set forth herein, Seaton shall (i) voluntarily resign all positions held as an officer and employee of ASPG and as an officer, employee, or director of each of ASPG's subsidiaries and affiliates, including SRI as of November 17, 2003 (the **"Resignation Date"**) by executing and delivering to the Company a letter of resignation in the form attached hereto as Exhibit A and (ii) Seaton shall perform and comply with the covenants and agreements set forth herein. The Company shall continue to pay Seaton's current salary and other benefits through the Effective Date, and will reimburse Seaton for reasonable documented Company expenses incurred by him through the Resignation Date, including any reasonable corporate expenses incurred by him or other Company employees and charged to his personal credit card.

3.     **Special Payments.**

a.     **Post-Termination Payment.** The Company shall pay or cause to be paid to Seaton $400,000 per year, for a period beginning on the Effective Date of this Agreement and ending on March 31, 2005 (**"Severance Period"**). Such payments shall be made in accordance with, and pursuant to the Company's customary payroll practices.

b.     **Benefits.** Unless and until the Company is advised by counsel that it is not permitted, Seaton shall be entitled to participate in any retirement plan (excluding any matching benefits provided by the Company), welfare plan (including without limitation any medical, prescription, dental and disability plan) in which he currently participates and which the Company continues to provide generally to its executives, or any replacement plan, if applicable, on the same terms and conditions on which Seaton currently participates, during the Severance Period. Upon expiration of the Severance Period, Seaton may, at his option, participate in health insurance provided by the Company solely at his own expense pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985. Unless and until the Company is advised by counsel that it is not permitted, during the Severance Period, the Company shall continue to pay all premiums for Seaton's personal life insurance policy and short-term and long-term disability insurance policies that are currently paid by the Company. Further, the Company shall not take any affirmative action to terminate or reduce the coverage provided to Seaton by the Company's director and officer liability insurance policy in effect on the date hereof.

c.     **Additional Benefits.** The Company shall pay Seaton $100,000 to use for outplacement services, off-site office space and/or secretarial services in his discretion, payable in six (6) equal installments of $16,667.67, with the first such installment payable to Seaton on the Effective Date and the remaining installments to be paid on the first business day of each month thereafter commencing on January 6, 2004. Upon execution of this Agreement, Seaton may make arrangements with the Company to remove, at his expense, the office furniture and other agreed-upon items provided to Seaton by the Company prior to the Resignation Date for his personal use. Seaton shall also be permitted to offer employment to one of the Company's administrative assistants to assist him in such office. In addition, the Company shall reimburse Seaton for all reasonable documented business expenses incurred by him in

connection with providing services to the Company pursuant to Paragraph 11(c) hereof.

        d.    **Car Allowance.** During the Severance Period, the Company shall continue to pay Seaton's car payments and related expenses for maintenance, tires, insurance and fuel for one (1) automobile reasonably comparable to that utilized by Seaton as of the Resignation Date, all to the extent consistent with past practice and similar amounts paid in the past.

        e.    **Unpaid Vacation/Sick Leave.** On the Effective Date, the Company shall pay Seaton $4,932.93 in full and complete satisfaction of (i) by the Company, $23,171.47 due to Seaton on the Resignation Date for accrued but unpaid vacation, sick leave pay and wages and (ii) by Seaton, $18,238.54 for amounts advanced by the Company to Seaton for business expenses.

        f.    **Legal Expenses.** The Company shall reimburse Seaton for reasonable and documented legal fees incurred by Seaton in connection with the preparation and negotiation of this Agreement.

        g.    **Restricted Cash Payment.** Upon receipt of payment of "restricted cash" (as defined in and pursuant to the Stock Purchase Agreement), the Company shall promptly pay such cash to Seaton in accordance with the terms of the Stock Purchase Agreement. Except as provided in the immediately preceding sentence, as between Seaton and the Company, the Stock Purchase Agreement shall be of no further force or effect.

        h.    **Airline Mileage.** The Parties agree that one million (1,000,000) airline miles credited to Seaton's Diners Club - Club Rewards Program (Account No. 3850373899000) are the property of the Company, that Seaton agrees not to utilize such miles, and from time to time, upon request of the Company, Seaton shall promptly transfer all or any portion of such miles to the Company or the Company's designee for use by it, its employees or representatives, in its sole discretion.

        i.    **SRI Board Seat.** Simultaneously with the execution and delivery of this Agreement, the Principal Investors (as defined in the Second Amended Shareholders' Agreement) and Seaton have executed a letter agreement in favor of Seaton's nomination as a member of the ASPG Board of Directors as a designee of the Principal Investors from the Effective Date through the expiration of the Severance Period. It is acknowledged and agreed by the Company that any breach by the Principal Investors under such letter agreement shall constitute a Breach by the Company under this Agreement.

        j.    **Special Payments.** Such payments, covenants and agreements under Paragraph 3(a) through (i) above, shall be collectively referred to as the **"Special Payments"**. Although the Company denies any liability with regard to Seaton's Claims, as defined in Paragraph 7 of this Agreement, Seaton and the Company agree that these Special

Payments represent full and complete settlement of all of Seaton's Claims. Seaton's right to the Special Payments shall be cancelled in the event that he breaches, in any respect, the provisions of Paragraphs 7 or 8 of the Employment Agreement (as amended herein) or Paragraphs 10 or 11 of this Agreement.

      4.    **Purpose of Payment**. The Company is providing and Seaton is accepting the Special Payments and the other covenants and agreements of the Company, in full and complete satisfaction of all of Seaton's Claims against the Company, and any and all of its parent, subsidiary and/or affiliate entities, their successors and assigns, and any and all of their past and present directors, officers, shareholders, consultants, agents, representatives, attorneys, employees, members, employee benefit plans and plan fiduciaries (collectively, the **"Releasees"**). Seaton further acknowledges (i) the sufficiency of the consideration for this Agreement generally and specifically for the release of any such Seaton's Claims in accordance with Paragraph 7 of this Agreement; and (ii) that no other monies or other consideration, except as expressly set forth in this Agreement, are due and owing to him or on his behalf by the Company or any of the other Releasees. Seaton represents, warrants and agrees that he will not make any claim or commence any action or proceeding against the Company or any of the other Releasees to recover attorneys' fees, costs or disbursements. Nothing contained herein is intended to prevent enforcement of this Agreement.

      5.    **Forfeiture of Restricted Stock.**

      a.    Seaton shall forfeit his entitlement to any and all of his remaining Restricted Shares, as well as the Down Payment (**"Forfeiture"**), in accordance with Paragraph 2(d) of the Stock Restriction Agreement, and shall deliver to the Company, on or before the Effective Date of this Agreement, any and all stock certificates pertaining to the Restricted Shares. As a result of the Forfeiture, the remaining 1999 Promissory Note in the principal amount of $585,000.00 and the corresponding Collateral Pledge Agreement shall be cancelled, and neither Seaton nor the Company shall have any further obligations or liabilities with respect to any of the 1999 Promissory Notes or any of the Collateral Pledge Agreements. The Company shall return the original 1999 Promissory Note in the principal amount of $585,000 and corresponding Collateral Pledge Agreement marked canceled on the Effective Date, or in lieu thereof shall provide an affidavit of loss with respect to such 1999 Promissory Note and Collateral Pledge Agreement.

      b.    In connection with the Forfeiture, the Company shall pay Seaton a cash payment of $65,000 in two equal installments of $32,500, with the first such installment due and payable on the Effective Date and the second such installment due and payable on January 15, 2004.

      6.    **No Admissions**. This Agreement does not constitute an admission by Seaton or the Company or any of the other Releasees of any violation of any contract or of any statutory, constitutional or common law of any federal, state or local government of the United

States or of any other country or political subdivision thereof, and Seaton, the Company and each of the other Releasees expressly deny any such violation or liability. This Agreement may not be introduced in any action or proceeding by anyone for any purpose except to evidence its terms.

## 7.   General Release by Seaton.

a.      In consideration of this Agreement and the monies and other good and valuable consideration provided to Seaton pursuant to this Agreement, Seaton hereby irrevocably and unconditionally releases, waives and forever discharges the Company and each of the other Releasees, from any and all actions, causes of action, claims, demands, damages, rights, remedies and liabilities of whatsoever kind or character, in law or equity, suspected or unsuspected, past or present, that he has ever had, may now have, or may later assert against the Releasees, whether or not arising out of or related to Seaton's employment by or the performance of any services (including as a member of the Board of Directors) to or on behalf of the Company and/or its affiliates and/or subsidiaries or the termination of that employment and those services, from the beginning of time to the Effective Date hereof (hereinafter referred to as **"Seaton's Claims"**), including without limitation:  (i) any claims arising out of or related to any federal, state and/or local labor or civil rights laws including, without limitation, the federal Civil Rights Acts of 1866, 1871, 1964 and 1991, the Age Discrimination in Employment Act of 1967, as amended by, *inter alia,* the Older Workers Benefit Protection Act of 1990, the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Family and Medical Leave Act of 1993, the Employee Retirement Income Security Act of 1974, the Consolidated Omnibus Budget Reconciliation Act of 1985, the Americans with Disabilities Act of 1990, the Fair Labor Standards Act of 1938, the Texas Commission on Human Rights, the Texas Labor Code and Labor Laws, as each may have been amended from time to time; and (ii) any and all other of Seaton's Claims arising out of or related to any contract, any and all other federal, state or local constitutions, statutes, rules or regulations, or under any common law right of any kind whatsoever, or under the laws of any country or political subdivision, including, without limitation, any of Seaton's Claims for any kind of tortious conduct, promissory or equitable estoppel, breach of the Company's policies, rules, regulations, handbooks or manuals, breach of express or implied contract or covenants of good faith, wrongful discharge or dismissal, and/or failure to pay in whole or part any compensation, bonus, incentive compensation, stock bonus or options, overtime compensation, severance pay or benefits of any kind whatsoever, including disability and medical benefits, back pay, front pay or any compensatory, special or consequential damages, punitive or liquidated damages, attorneys' fees, costs, disbursements or expenses.

The foregoing shall not constitute a release or waiver of any claims, demands, damages, rights, remedies or liabilities arising out of the failure to comply or breach by ASPG after the Effective Date with or of any of (i) the Second Amended Shareholders' Agreement, (ii) the 1996 Accession Agreement, (iii) the 1999 Accession Agreement, (iv) the 2002 Subordinated Promissory Note, or (v) this Agreement.

b.      To the fullest extent permitted by law, Seaton agrees not to lodge

any formal or informal complaint in court, with any federal, state or local agency or any other forum, including without limitation arbitration in any jurisdiction, arising out of or related to (i) Seaton's Claims, (ii) Seaton's employment by or performance of services (including as a member of the Board of Directors) to or on behalf of the Company and/or its subsidiaries or any of the other Releasees or the termination of that employment or other services through the Resignation Date, or (iii) events, circumstances or occurrences prior to the Effective Date. Seaton hereby represents and warrants that he has brought no complaint, claim, charge, action or proceeding against any of the Releasees in any jurisdiction or forum. Seaton further represents, warrants and agrees that he has not in the past and will not in the future assign any of Seaton's Claims to any person, corporation or other entity.

        c.     Execution of this Agreement by Seaton operates as a complete bar and defense against any and all of Seaton's Claims against the Company and/or the other Releasees. If Seaton should hereafter make any of Seaton's Claims in any charge, complaint, action, claim or proceeding against the Company or any of the Releasees, the Agreement may be raised as and shall constitute a complete bar to any such action, claim or proceeding and the Company and/or the Releasees shall be entitled to and shall recover from Seaton all costs incurred, including attorneys' fees, in defending against any such charge, complaint, action, claim or proceeding.

        8.     **General Release by the Company.**

        a.     In consideration of this Agreement and other good and valuable consideration provided to the Company pursuant to this Agreement, the Company hereby irrevocably and unconditionally releases, waives and forever discharges Seaton from any and all actions, causes of action, claims, demands, damages, rights, remedies and liabilities of whatsoever kind or character, in law or equity, suspected or unsuspected, past or present, that it has ever had, may now have, or may later assert against Seaton, whether or not arising out of or related to Seaton's employment by or the performance of any services (including as a member of the Board of Directors) to or on behalf of the Company and/or its affiliates and/or subsidiaries or the termination of that employment and those services, from the beginning of time to the Effective Date hereof (hereinafter referred to as the **"Company's Claims"**), including without limitation, any and all other of the Company's Claims arising out of or related to any contract, any and all other federal, state or local constitutions, statutes, rules or regulations, or under any common law right of any kind whatsoever, or under the laws of any country or political subdivision, including, without limitation, any of the Company's Claims for any kind of tortious conduct, promissory or equitable estoppel, breach of the Company's policies, rules, regulations, handbooks or manuals, breach of express or implied contract or covenants of good faith, or any compensatory, special or consequential damages, punitive or liquidated damages, attorneys' fees, costs, disbursements or expenses.

The foregoing shall not constitute a release or waiver of any claims, demands, damages, rights, remedies or liabilities arising out of the failure to comply or breach by Seaton after the Effective

Date with or of any of (i) the Second Amended Shareholders' Agreement, (ii) the 1996 Accession Agreement, (iii) the 1999 Accession Agreement, (iv) the 2002 Subordinated Promissory Note, or (v) this Agreement.

Notwithstanding the foregoing, the Company shall retain all rights with respect to any and all claims, demands, damages, rights, remedies and liabilities of whatsoever kind or character, in law or equity, suspected or unsuspected, past or present, that it ever had, or may later assert against Seaton which may arise from or be related to (i) any acts or omissions undertaken by Seaton which constitute fraud, theft or embezzlement, or any act that constitutes a felony under the laws of the United States or any state; or (ii) any act undertaken by Seaton in knowing and willful violation of a specific written Company directive, that the Company did not approve of or condone, which causes the Company material harm or subjects it to material liability.

           b.      To the fullest extent permitted by law, the Company agrees not to lodge any formal or informal complaint in court, with any federal, state or local agency or any other forum, including without limitation arbitration in any jurisdiction, arising out of or related to (i) the Company's Claims, (ii) Seaton's employment by or performance of services (including as a member of the Board of Directors) to or on behalf of the Company and/or its subsidiaries, or (iii) events, circumstances or occurrences prior to the Effective Date. The Company hereby represents and warrants that it has brought no complaint, claim, charge, action or proceeding against Seaton in any jurisdiction or forum. The Company further represents, warrants and agrees that it has not in the past and will not in the future assign any of the Company's Claims to any person, corporation or other entity.

           c.      Execution of this Agreement by the Company operates as a complete bar and defense against any and all of the Company's Claims against Seaton. If the Company should hereafter make any of the Company's Claims in any charge, complaint, action, claim or proceeding against Seaton, the Agreement may be raised as and shall constitute a complete bar to any such action, claim or proceeding and Seaton shall be entitled to and shall recover from the Company all costs incurred; including attorneys' fees, in defending against any such charge, complaint, action, claim or proceeding.

        9.      **Company's Obligation to Indemnify.** The Company shall indemnify and hold Seaton harmless from and against any and all liability, loss, damage, claim or deficiency, including reasonable attorney's fees (**"Loss"**), resulting from Seaton's employment by the Company, performance of his duties as an officer of the Company, or any other relationship with the Company, including as a director of the Company, to the full extent provided in the certificate of incorporation and bylaws of the Company as in effect on the Resignation Date, subject to applicable law. The Company shall direct that all credit cards issued in Seaton's name in its possession be destroyed.

        10.      **Confidentiality.**

a.    Seaton agrees that he will not, directly or indirectly, use or disclose, or permit or aid the use or disclosure, to any person, firm, entity or corporation, of any privileged, confidential or proprietary business information, including by way of example and without limitation, any trade secrets, market reports, customer investigations, customer lists, observations or data relating to the business, affairs, clients, customers, business partners, plans, proposals, finances or financial condition of the Company or any of the other Releasees, which such information Seaton received or receives as a consequence of his employment with or service to the Company (including as a director before or after the Resignation Date or pursuant to any agreement or instrument with the Company) (**"Confidential Information"**), except (i) with the Company's express written consent; (ii) in direct response to any subpoena initiated against or served upon Seaton; or (iii) in direct response to a formal request for information from the Equal Employment Opportunity Commission as part of an active investigation (**"EEOC Request"**). In the event that disclosure is sought from Seaton in direct response to any such subpoena or EEOC Request, Seaton shall give the Company immediate written notice of such subpoena or EEOC Request in order to afford the Company an opportunity to evaluate its legal rights and take such action as the Company considers to be appropriate to protect the interests of the Company.

b.    Seaton and the Company agree that the existence of this Agreement and its terms and conditions and the compromise negotiations which concluded with this Agreement shall be kept and remain strictly confidential except to the extent that disclosure is required by law or regulations of any governmental authority, and, as to the Company only, in connection with disclosure to the Company's agents, accountants, attorneys and management employees, or, as to Seaton only, in connection with disclosure to his attorney, financial advisor and immediate family, provided, however, that Seaton shall cause his attorney, financial advisor and immediate family to keep such information in strictest confidence. Seaton represents and warrants that he has not, directly or indirectly, disclosed any Confidential Information or any information which he has agreed in this Paragraph 10 shall remain strictly confidential.

c.    Notwithstanding anything to the contrary contained herein, as of the Effective Date of this Agreement, each Party (and each employee, representative, or other agent of each such Party) may disclose to any and all persons, without limitations of any kind, the tax treatment and tax structure of the transactions contemplated hereby and all materials of any kind (including opinions or other tax analyses) that are provided to any Party relating to such tax treatment and tax structure; provided, however, that the foregoing permission to disclose the tax treatment and tax structure does not permit the disclosure of any information that is not relevant to understanding the tax treatment or tax structure of the transactions (including the identity of any Party and the amounts paid in connection with the transactions). In addition, no Party is subject to any restriction concerning its consulting with its tax adviser regarding the tax treatment or tax structure of the transaction at any time.

d.    Seaton is obligated to surrender and acknowledges that he has surrendered or will surrender to ASPG on or before the Effective Date, all property of the Company and the other Releasees in whatever form retained (e.g., written, mechanical,

electronic) including, but not limited to, all documents, memoranda, notes, papers, contracts, drafts, data, records, reports, plans, proposals, computer tapes, printouts, software and other information and property, in whatever form, including any copies thereof, that relate to the business of the Company, in the possession of or under the control of Seaton. All such property shall be sent to ASPG, Attention: Chairman of the Board, 701 Leander Drive, Leander, Texas 78641.

          e.     Seaton agrees that all Work Product (as defined below) is owned by the Company. Seaton will promptly perform all actions reasonably requested by the Company to establish and confirm such ownership (including, without limitation, the execution and delivery of assignments, consents, powers of attorney and other instruments) and to provide reasonable assistance to the Company in connection with the prosecution of any applications for patents, trademarks, trade names, service marks, copyright registrations or reissues thereof or in the prosecution or defense of interferences relating to any Work Product. As used herein, "Work Product" shall mean all inventions, innovations, improvements, technical information, systems, software developments, methods, designs, analyses, drawings, reports, service marks, trademarks, tradenames, logos and all similar or related information (whether patentable or unpatentable) which relates to actual or anticipated business, research and development or existing or future products or services of the Company and which were conceived, developed or made by Seaton (whether or not during usual business hours and whether or not alone or in conjunction with any other person) while employed by the Company through the Resignation Date (including those conceived, developed or made prior to the date of the Employment Agreement) together with all patent applications, letters patent, trademark, tradename and service mark applications or registrations, copyrights and reissues thereof that may be granted for or upon any of the foregoing.

          f.     The provisions of this Paragraph 10 are material and critical terms of this Agreement, and the Parties agree that, in the event that Seaton breaches any of the provisions of this Paragraph 10, the Company shall be entitled to injunctive relief regardless of and in addition to any other remedies which are available.

        11.    **Non-Competition, Non-Solicitation, Cooperation, Non-Disparagement; Services to be Provided by Seaton.**

         a.     Seaton acknowledges that during the course of his employment with the Company he has become familiar with the Company's trade secrets and other Confidential Information (as defined in Paragraph 10 of this Agreement) and that his services were of special, unique and extraordinary value to the Company. Therefore, Seaton agrees that during the Severance Period (the **"Non-Compete Period"**) Seaton will not, without the prior written consent of the Company, in any capacity, whether for his own account or for any other person or entity, directly or indirectly, with or without compensation, (i) own, operate, manage or control, or (ii) serve as a director, officer, consultant, employee, partner, joint venturer, member, agent or advisor or in any similar capacity to, or (iii) have any financial interest in, or aid or assist

anyone else in the conduct of, any "Indirect Competitor" or "Direct Competitor" of the Company.

For purposes of this Agreement, an **"Indirect Competitor"** or a **"Direct Competitor"** is a person, entity or business which provides services offered or proposed to be offered by the Company or is engaged in the sale, manufacture or distribution of any products which are competitive with those sold or proposed to be sold by the Company or which are an alternative product for the use for which any of the Company's products are marketed.

       b.     During the Non-Compete Period, Seaton shall not directly, or indirectly through another entity (i) induce or attempt to induce any employee of the Company to leave the employ of the Company, or in any way interfere with the relationship between the Company and any employee thereof, (ii) hire any person who is or was a key employee of the Company at any time during the 12 months prior to the Effective Date until the latter of (A) the first anniversary of the Effective Date or (B) the first anniversary of the termination of such key employee's employment with the Company, or (iii) induce or attempt to induce any Customer, supplier, licensee, licensor, franchisee or other business relation of the Company to cease doing business with the Company, or in any way interfere with the relationship between any such Customer, supplier, licensee or business relation and the Company. For purposes of this Paragraph 11(b), the term **"Customer"** means any Person to which the Company provided services or sold goods or with respect to which the Company solicited to provide services or to sell goods during the 24-month period prior to the Resignation Date.

       c.     Seaton shall cooperate with the Company by assisting it in the orderly transition of his duties and, at the Company's request, provide it with information regarding the financial, business and legal affairs of the Company and meet with its officers, directors, attorneys and representatives from time-to-time and render such other assistance as may be reasonably required on an as needed basis. In addition, Seaton shall provide consulting services to the Company as requested from time to time during the Non-Compete Period, as more fully described on Schedule I hereto.

       d.     Seaton agrees that he will not make any statement disparaging the Company or any of the other Releasees or otherwise interfere with or disrupt the business of the Company or any of the other Releasees. The Company agrees that it will direct its officers, employees and directors not to make any statement disparaging Seaton.

       e.     The provisions of this Paragraph 11 are material and critical terms of this Agreement, and Seaton agrees that, in the event that he breaches any of the provisions of this Paragraph 11, the Company shall be entitled to injunctive relief regardless of and in addition to any other remedies which are available. Seaton agrees that the restrictions contained in this Paragraph 11 are reasonable.

       f.     Seaton acknowledges that the Company is providing the Special Payments identified in Paragraph 3 of this Agreement in reliance on Seaton's agreement to

comply with Paragraphs 7 and 8 of the Employment Agreement (as amended herein) and Paragraphs 10 and 11 of this Agreement, and that in light of the Company's agreement to provide the Special Payments and the other consideration that Seaton is receiving from the Company pursuant to this Agreement, Seaton's former high level position with the Company and the Confidential Information which he possesses, the restrictions and covenants of this Paragraph 11 are reasonable and necessary.

12. **Agreement Enforceable**. Nothing contained herein is intended to prevent Seaton or the Company from enforcing this Agreement.

13. **Remedies for Breach**. In the event that either Party breaches, violates, fails or refuses to comply with any of the provisions, terms or conditions or any of the warranties or representations of this Agreement (the **"Breach"**), in its sole discretion the non-breaching Party shall recover against the breaching Party damages, including reasonable attorneys' fees, accruing to the non-breaching Party as a consequence of the Breach. Regardless of and in addition to any right to damages the non-breaching Party may have, the non-breaching Party shall be entitled to injunctive relief. In addition to any other remedy available to Seaton, in the event of a material Breach by the Company that remains uncured for 15 days following written notice thereof by Seaton to the Company, Seaton's obligations under Paragraph 11 of this Agreement shall terminate automatically and be of no further force and effect.

14. **Certain Representations and Warranties.** Seaton hereby represents and warrants to the Company that (i) the execution, delivery and performance of this Agreement by Seaton do not and shall not conflict with, breach, violate or cause a default under any contract, agreement, instrument, order, judgment or decree to which Seaton is a party or by which he is bound, and (ii) upon the execution and delivery of this Agreement by the Company, this Agreement shall be the valid and binding obligation of Seaton, enforceable in accordance with its terms. The Company hereby represents and warrants to Seaton that (i) the execution, delivery and performance of this Agreement by the Company does not and shall not conflict with, breach, violate or cause a default under any contract, agreement, instrument, order, judgment or decree to which the Company is a party or by which the Company is bound, and (ii) upon the execution and delivery of this Agreement by Seaton, this Agreement shall be the valid and binding obligation of the Company, enforceable in accordance with its terms.

15. **No Reliance**. Neither the Company nor Seaton is relying on any representations made by the other (including any of the Releasees) regarding this Agreement or the implications thereof, except for representations expressly set forth herein.

16. **Miscellaneous Provisions.**

a. No oral understanding, statements, promises or inducements contrary to the terms of this Agreement exist. This Agreement cannot be changed or terminated orally.

b.      Should any provision of this Agreement be held invalid, illegal or unenforceable, it shall be deemed to be modified so that its purpose can lawfully be effectuated and the balance of this Agreement shall be enforceable and remain in full force and effect.

c.      This Agreement shall extend to, be binding upon, and inure to the benefit of the Parties and their respective successors, heirs and assigns.

d.      This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to any choice of law or conflict of law rules or provisions (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware. Any action or proceeding between the Parties shall be commenced in the state or federal court located in the State of New York or Texas, and the Parties hereby submit to the exclusive jurisdiction of the state or federal courts located in New York, New York or Austin, Texas, respectively, and further agree not to assert that any action brought in either jurisdiction has been brought in an inconvenient forum.

e.      This Agreement may be executed in any number of counterparts each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one and the same agreement.

f.      The Company agrees to issue a press release to the effect that Seaton has resigned his employment with the Company in order to pursue other interests and that the Company wishes him well in his future endeavors.

g.      Except to the extent provided in Paragraph 3(f) hereof, each of the parties hereto agree to bear the expenses incurred by him/it in connection with the transactions contemplated by this Agreement.

17.    **Notices.**  All notices or other communications between the Parties hereunder shall be deemed effective if in writing and mailed by certified mail (return receipt requested), hand delivered, sent by facsimile (with a copy sent by mail) or sent by Federal Express or like recognized overnight express mail service, as follows:

Any notice given to the Company shall be sent to the following addresses:

American Sports Products Group Inc.
701 Leander Drive
Leander, Texas 78641
Attn:   Chairman
Telephone: (512) 259-0080
Telecopier: (512) 259-4221

American Sports Products Group Inc.
701 Leander Drive
Leander, Texas 78641
Attn:   President and Chief Executive Officer
Telephone: (512) 259-0080
Telecopier: (512) 259-4221

With a copy to (which shall not constitute notice):

UBS Capital Americas, LLC
48 Signal Road
Stamford, Connecticut  06902
Attn:  James Breckenridge
Telephone:  (203) 719-8081
Telecopier:  (203) 357-8250


Kaye Scholer LLP
425 Park Avenue
New York, New York 10022
Attn:  John D. Geelan, Esq.
Telephone:  (212) 836-8121
Telecopier:  (212) 836-8689

Any notice given to Seaton shall be sent to the following address:

Reed J. Seaton
11009 Pencewood Court
Austin, Texas 78750
Telephone:  (512) 633-1501
Telecopier:  (512) 250-9208

With a copy to (which shall not constitute notice):

Drenner Stuart Wolff Metcalfe von Kreisler, LLP
301 Congress Avenue, Suite 1200
Austin, Texas 78701
Attn:  Donald L. Stuart, Esq.
Telephone:  (512) 404-2200
Telecopier:  (512) 404-2244

Notices delivered by overnight mail shall be deemed given when received.  Notices sent by fax shall be deemed given when an acknowledgment receipt is obtained by sender.  Notices delivered

by certified mail shall be deemed given three business days after mailing. Parties may change their address for notices in a notice given pursuant to this Paragraph 17.

18.     **Effective Date/Revocation**.  Seaton may revoke this Agreement in writing at any time during a period of seven (7) calendar days after the execution of this Agreement (the **"Revocation Period"**).  If revoked during the Revocation Period, this Agreement shall be of no force or effect and the Parties shall have no rights hereunder.  Unless so revoked, this Agreement shall automatically be effective and enforceable on the eighth (8th) calendar day following Seaton's execution of the Agreement (the **"Effective Date"**).

19.     **Acknowledgment**.  In signing this Agreement, Seaton acknowledges that: (a) he has read and understands this Agreement and has been given the opportunity to consult with an attorney before signing this Agreement; (b) he has signed this Agreement voluntarily, and understand that this Agreement contains a full and final release of all of Seaton's Claims against the Company Releasees, except as otherwise expressly provided in Paragraph 7(a) of this Agreement; (c) he has been offered and has waived at least twenty-one (21) calendar days to consider this Agreement; and (d) this Agreement is not made in connection with an exit incentive or other employee termination program offered to a group or class of employees.

**IN WITNESS WHEREOF**, the Parties have hereunto set their hand and executed this Agreement as of the day and year first set forth above.

Reed J. Seaton

_____     November 21, 2003
                                             Date of Execution by Seaton

American Sports Products Group Inc.

By:_____          November 21, 2003
                                             Date of Execution by ASPG

Title:_____


Southwest Recreational Industries, Inc.

By:_____          November 21, 2003
                                             Date of Execution by SRI

Title:_____

**IN WITNESS WHEREOF,** the Parties have hereunto set their hand and executed this Agreement as of the day and year first set forth above.

Reed J. Seaton

_____          November 21, 2003
                                          Date of Execution by Seaton

American Sports Products Group Inc.

By: _____              November 21, 2003
                                          Date of Execution by ASPG
Title: _VP&CFO_____

Southwest Recreational Industries, Inc.

By: _____              November 21, 2003
                                          Date of Execution by SRI
Title: _Vice President_____

30730326.WPD                      16

# SCHEDULE I

Seaton shall provide advice and assistance to the Company from time to time as it may reasonably request with respect to the business and affairs of the Company. Such advice and assistance shall include making himself available to consult with officers and directors of the Company at the Company's offices or at such other locations as the Company request from time to time. Such services shall also include the following:

1.      Seaton shall provide advice and assistance with respect to any and all current on-going litigation involving the Company (including the Armstrong litigation), including the following:

- consulting with the Company's attorneys regarding any of the claims and/or defenses,

- providing the Company's attorneys with any and all relevant documents relating to any of the claims and/or defenses,

- providing truthful testimony at a deposition and/or at trial or any hearing,

- attending any mediation or other sessions before a third party, and/or

- consulting with the Company's management and Boards of Directors.

2.      Seaton shall provide advice and assistance with respect to obtaining and maintaining bonding in connection with the Company's business. Such services shall include the following:

- at the written direction of the Board of Directors, interfacing with the applicable contact persons at bonding companies with which the Company does business, including The Hartford Insurance Company,

- providing the Company's Board of Directors with any and all relevant documents,

- attending any meetings or making any related contacts as requested by the Company's Board of Directors, and/or

- consulting with the Company's Board of Directors.

30730326.WPD                                17

## EXHIBIT A

Reed J. Seaton
11009 Pencewood Court
Austin, Texas  78750

as of November 17, 2003

Board of Directors
American Sports Products Group Inc.
701 Leander Drive
Leander, Texas 78641

Board of Directors
Southwest Recreational Industries, Inc.
701 Leander Drive
Leander, Texas 78641

Ladies and Gentlemen:

Please accept this letter as confirmation of my resignation from all of my positions as an officer, employee or otherwise (other than as a member of the Board of Directors) of ASPG and as an officer, employee, director or otherwise with each of ASPG's subsidiaries and affiliates, including SRI, effective as of the date set forth above.   I understand and agree that, except as expressly and specifically provided for in the Separation Agreement and General Release among ASPG, SRI and me (the "Separation Agreement"), all agreements with the Company (as defined in the Separation Agreement) are superseded by the Separation Agreement, and that I have no further duties or rights as an officer, employee, director or otherwise of the Company or any of its constituent entities (subject to my serving as a director of ASPG, subject to and in accordance with the Second Amended Shareholders' Agreement (as defined in the Separation Agreement), as amended.  This letter shall become effective as of the Effective Date (as defined in the Separation Agreement).

Please indicate acceptance of my resignations and agreements by counter-signing below.

Sincerely,

Reed J. Seaton

ACCEPTED ON BEHALF OF ASPG:          ACCEPTED ON BEHALF OF SRI:

By:_____          By:_____
   Name:                                   Name:

30730326.WPD                          18